578 So.2d 71 (1991)
GULF STATES UTILITIES COMPANY
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
Nos. 88 CA 0709, 90 CA 0445.
Supreme Court of Louisiana.
April 5, 1991.
Rehearing Denied June 20, 1991.
*73 James Leeper Ellis, Tom F. Phillips, Frederick R. Tulley, Taylor, Porter, Brooks & Phillips, Richard Lorenzo, New York City, Henry Macnicholas, Harrisburg, Pa., Lee Charles Kantrow, Kantrow, Spaht, Weaver & Blitzer, APLC, Baton Rouge, for Gulf States Utilities Co., appellant.
Robert Lewis Rieger, Jr., Theodore Lutrell Jones, Elizabeth F. Amos, Jones & Amos, Baton Rouge, Noel Joseph Darce, Michael R. Fontham, Paul Lewis Zimmering, Stone, Pigman, Walther, Wittman & Hutchinson, New Orleans, La., for La. Public Service Com'n, appellant.
Richard M. Troy Jr., New Orleans, J. David McNeill III, La. Dept. of Justice, La. State Office, Baton Rouge, for appellant.
James M. Field, Gary, Field, Landry & Dornier, Baton Rouge, for La. Food Stores, appellant.
CALOGERO, Chief Justice.
These are consolidated appeals from two district court decisions arising out of a rate case filed on July 25, 1986 with the Louisiana Public Service Commission by Gulf States Utilities Co. Gulf States sought to obtain rate support for River Bend 1, a $4.4 billion, 940 megawatt nuclear plant completed in 1986.[1] Gulf States owns 70 per cent of the plant, reflecting an investment of $3 billion; the remaining 30 per cent is owned by Cajun Electric Power Cooperative. On December 15, 1987, after lengthy hearings, the Commission issued Order No. U-17282-C, in which it disallowed $1.4 billion *74 of the company's investment in River Bend[2] upon a finding of imprudence, granted Gulf States a first year rate increase of $63 million, which represented a 12% return on equity, and adopted the framework of a phase-in plan for the remainder of the prudent portion of the investment. Gulf States sought to enjoin the part of the order limiting it to a first year return on equity of 12%. On February 18, 1988, Judge Brown of the 19th judicial district issued a preliminary injunction granting the company a first year rate increase of $92 million, reflecting a rate of return on equity of 14%. From that decision the Commission and the State through the Attorney General have perfected appeals. Gulf States also appealed the Commission's imprudence disallowance. On October 11, 1989, after six weeks of hearings, Judge Landry, sitting as Judge Ad Hoc of the 19th judicial district court, rendered a decision upholding the Commission's finding of imprudence, but also ordering the implementation of a "rate base exclusion plan" that would allow Gulf States to obtain revenue support for the imprudent part of its investment. From that decision, the Commission, the State, and the utility have appealed.
As will be evident from the lengthy discussion which follows, the issues presented for our determination in these appeals include: (1) whether Gulf States' due process rights were violated by the manner in which the Commission conducted the hearing in this case, and the appropriate standard of review to be applied to Public Service Commission Order No. U-17282-C; (2) whether the Commission was unreasonable or arbitrary in finding that Gulf States' 1979 decision to restart River Bend was imprudent; (3) whether the district court's decision on the merits which ordered the implementation of a "rate base exclusion plan" was a proper exercise of that court's judicial authority; (4) and whether, in the injunction proceeding, the district court acted within its discretion in increasing Gulf States' first year rate of return on equity from 12% to 14%.
As will also be evident from the following discussion, we find that Gulf States' due process rights were not violated, and the appropriate standard of review in this case to be that articulated by this Court in numerous previous rate cases: Commission orders will be upheld unless they are arbitrary, capricious, or not reasonably supported by the evidence. We further find the Commission's disallowance of $1.4 billion of Gulf States' investment in River Bend as imprudent to be reasonably supported by the extensive record compiled in this case. Regarding the district court's implementation of a rate base exclusion plan, we find that order to be a preemption of the Commission's primary authority to set fair and reasonable rates. Once it had affirmed the Commission's finding of imprudence, it was not within the court's discretionary powers to ameliorate the effect of that determination. Finally, we find an injunction action in a rate increase case to *75 be an improper proceeding in which to increase the rate of return on equity granted by the Commission, when the court has not found the lower rate to be confiscatory.

FACTS AND PROCEDURAL HISTORY
River Bend was planned in the early 1970s by Gulf States, a Texas corporation providing electrical service to both Louisiana and Texas residents, businesses, and industrial users. Until that time, the company had relied on gas-fired generators to provide an electric power supply to its customers. The company experienced a need for alternate power sources, however, as a result of a variety of factors, including severe natural gas curtailments, a load growth which had averaged approximately 11% annually for the preceding four decades, and new federal regulations. The decision to build River Bend was predicated on three extensive economic studies commissioned by Gulf States. Those studies, performed by Stone & Webster and Bechtel Corp., examined the total costs of producing energy from various types of generators over the lives of the units, and concluded that the nuclear option was economically preferable to the alternatives. That conclusion was supported by then current industry-wide data, internal studies, and publications of the Nuclear Regulatory Commission. The initial estimate of the cost of River Bend, made in 1971, was $307 million. Gulf States continued to evaluate other power sources as well, and by 1975, included both coal and nuclear fuel in its generation plans. In addition, it had begun acquiring lignite reserves in Texas and Louisiana. During this period, the company also entered into negotiations with Cajun Electric in an attempt to sell a portion of the proposed River Bend unit.
The decision to build River Bend was affected, however, by a significant drop in load growth on Gulf States' system, resulting in part from the Arab oil embargo and the national recession of 1974-1975. In addition, in January 1977, the Louisiana Public Service Commission rejected the company's application for a $23.8 million rate increase. The decrease in load growth and failure to secure rate relief led Gulf States to suspend the River Bend project in 1977. At that time, construction at the site had not begun, and the utility had invested approximately $350 million in preliminary expenditures. The suspension remained in effect for the next two years.
Gulf States' load growth rebounded, however, to 12% in 1977 and 10% in 1978. Further, in 1978, Congress passed the Fuel Use Act, which mandated that no new gasfired or oil generating plants could be built, and prohibited the use of natural gas in existing generating plants after 1989. Faced with a need to replace its gas-fired plants and a projected 5.9% compounded growth rate in service demand, Gulf States reevaluated its options. Studies performed by the company indicated a continued advantage for nuclear generation over coal, and in June 1977, Stone & Webster, River Bend's contractor, presented an updated cost estimate for the plant of $1.3 billion.
During the spring of 1978, under a new Board Chairman, Gulf States began a program to determine the most advantageous way to accomplish fuel diversification. Management Analysis Co. completed an evaluation of Stone & Webster's River Bend construction cost estimate, concluding that there was a 90% probability that River Bend would cost $1.7 billion or less, and a 50% probability that the cost would be $1.5 billion. An in-house analysis also calculated the construction cost to be $1.5 billion. In July 1978, Gulf States produced a study concerning the financial impact of various planning alternatives over a ten year period, which indicated that building River Bend, with a concurrent sale of a portion of the unit, was the best economic alternative.
In August 1978, the Board of Directors met to make a decision on River Bend. During that meeting, the Chairman concluded that the company would not be likely to receive rate relief from either the Louisiana or Texas regulators if River Bend were cancelled, and that the shareholders could not absorb $4 million in sunk and cancellation costs, even with the benefit of a 50% tax write-off. Following a *76 discussion of all of its options, the Board concluded that a sale of the unit was one of its best alternatives. Gulf States' management therefore embarked on a national and international marketing effort to sell River Bend, an effort which was to prove unsuccessful. In the meantime, the company decided to evaluate the possibility of changing contractors for the project, and solicited bids from four major engineering/construction firms. The bids were evaluated by company committees and by two outside firms, Management Analysis Co. and NUTECH. The NUTECH evaluation determined that construction cost estimates were in a range of $1.67 to $1.77 billion, while Management Analysis Co. concluded that there was a 90% probability that the construction cost would be in the range of $1.7 to $1.88 billion. Ultimately Stone & Webster was awarded the contract on a cost-plus basis.
On November 15, 1978, Gulf States filed testimony before the Public Service Commission and presented calculations showing River Bend to be an economical generating alternative to meet the increases in load growth expected during the next decade. The calculations were based on the company's official estimate of the unit's cost, $1.3 billion. In late November, the Nuclear Regulatory Commission published the results of a study of nuclear and coal costs that indicated some advantage for nuclear units. In December 1978, the Commission granted the company's application for rate relief to support its River Bend construction program, based on Gulf States' projected service demand. A certification order approving the construction had also been sought and received that year from the Texas Public Utility Commission.
In January 1979, Gulf States' Chairman brought the River Bend project before the Board for a final decision. At that time, the company had an informal agreement with Cajun to sell it 30% of the unit. On February 8, 1979, the Gulf States Board met and approved the restart of the River Bend project. Site work resumed at that time, and the first structural concrete was poured in August 1979. On March 28, 1979, shortly after the decision to restart construction was made, but before significant site work had taken place, an extremely serious nuclear accident occurred at the Three Mile Island nuclear plant in Pennsylvania. A company task force evaluated the impact that the accident was likely to have on River Bend, and 5½ weeks later issued a report which concluded that the accident's effect would be minimal because of the dissimilarities between the types of reactors used in the respective plants. In August 1979, Cajun signed a formal agreement to purchase 30% of River Bend. The agreement, however, obligated Gulf States to buy back a decreasing amount of electricity from Cajun's portion for the first 5 years of River Bend's operation. In September 1979, the contractor, Stone & Webster, completed a comprehensive study, and predicted that River Bend would cost a total of $1.7 billion.
River Bend went into commercial operation on June 16, 1986, and on July 25, 1986, Gulf States filed an application with the Public Service Commission requesting a rate increase to recover the Louisiana portion of its $3 billion investment in the $4.4 billion plant. On December 15, 1987, after more than 40 days of hearings before a Hearing Examiner, the Commission issued an order finding that the company's decision to restart the River Bend project in 1979 had been imprudent. Based on its consultants' estimates of the cost of the alternatives that had been available to Gulf States, the Commission disallowed $1.4 billion of the $3 billion investment and excluded the Louisiana share of that amount (approximately $677 million) from the company's Louisiana rate base. Further, the Commission granted a first year rate increase of $63 million, which represented a 12% return on the company's equity, and approved the framework of a phase-in plan for the remaining Louisiana portion of the $1.6 billion investment which had been determined to be prudent.
Pursuant to LSA-R.S. 45:1192, Gulf States sought emergency relief from the order in the 19th judicial district court. On February 18, 1988, Judge William Brown issued an injunction granting the company *77 a first year rate increase of $92 million, representing a 14% return on equity, and implementing a specific phase-in plan for the deferred portion of the prudent River Bend investment. Pursuant to La. Const. art. IV, § 21, that order is being appealed to this Court by the Commission and the Attorney General of Louisiana, who argue that the court erred in increasing the rate of return set by the Commission, and that a preliminary injunction action was not an appropriate proceeding in which to secure such an order.
In addition to seeking emergency injunctive relief, Gulf States appealed the Commission's imprudence disallowance. That appeal was the subject of 6 weeks of hearings before Judge Paul Landry, sitting as Judge Ad Hoc of the 19th judicial district. During that proceeding, Gulf States presented an "inventory plan" for the resolution of the imprudence disallowance. Under the plan, the proportion of the plant's capacity which is equivalent to the $1.4 billion excluded by the Commission from the rate base would become a deregulated asset. Gulf States would buy, or would sell off-system, energy from this capacity, thereby allowing the utility to obtain revenue support for the imprudent portion of its investment in River Bend. At the conclusion of the hearings, Judge Landry remanded the matter to the Commission for consideration of the new evidence adduced on appeal.
After further hearings, the Commission issued Order No. U-17282-D, reaffirming its imprudence disallowance, but also proposing a settlement offer. The offer included a "rate base exclusion plan," somewhat similar to the "inventory plan" proposed by Gulf States. The Commission's plan would guarantee the purchase of energy by Louisiana ratepayers from the excluded portion of the plant at a price of 4.6 cents per kilowatt hour. The offer also required the company to share with its ratepayers any profits earned on off-system sales of energy from the excluded portion of the plant or a sale of the plant itself, and to accept a rate of return of 12.75%. Finally, the offer provided that both parties would drop their respective appeals. The Commission's order specified that if Gulf States rejected the rate base exclusion plan, the findings and conclusions of its previous order, No. U-17282-C, were to be reinstated. The plan was rejected by Gulf States, and the case returned to the district court for briefing and argument. On October 11, 1989, Judge Landry affirmed the Commission's finding of imprudence, but also ordered the implementation of the rate base exclusion plan proposed earlier by the Commission. As noted above, Gulf States, the Commission, and the Attorney General have appealed that decision. Gulf States seeks a reversal of the Commission's finding, affirmed by the district court, that its 1979 decision to restart River Bend was imprudent. Both the Commission and Attorney General appeal that part of the court's order implementing the rate base exclusion plan. In addition, the Attorney General contends that the disallowance for the company's imprudence should have been even greater than that imposed by the Commission.
Because the issues raised by the appeals of the two district court decisions are distinguishable, we will address them separately, in the following order: No. 90-CA-0445: I. Standard of Review and Due Process (page 9); II. Prudence (page 22); III. Rate Base Exclusion Plan (page 47); and No. 88-CA-0709: IV. Rate of Return on Equity (page 55).

90-CA-0445

I. STANDARD OF REVIEW AND DUE PROCESS
The standard of judicial review of ratemaking determinations by the Public Service Commission has been described by this Court on numerous occasions. We have noted that:
While we thus have the power and it is undoubtedly our duty to set aside the rulings of the Commission where we believe them to be clearly wrong on the facts and/or the law, we nevertheless should accord great weight to the rulings of the Commission and should not overturn them in the absence of a clear showing of error. Courts should act slowly in *78 substituting their own views and discretion for those of a body peculiarly constituted to act intelligently in such cases and primarily charged with doing so.
Southern Bell Telephone & Telegraph Co. v. Louisiana Public Serv. Comm'n, 239 La. 175, 118 So.2d 372, 378 (1960). We have also said that the Commission's orders are presumed valid, Gulf States Utilities Co. v. Louisiana Public Serv. Comm'n, 364 So.2d 1266 (La.1978), and are not to be overturned absent a showing of arbitrariness, capriciousness, or abuse of authority by the Commission. Central La. Elect. Co. v. Louisiana Public Serv. Comm'n, 508 So.2d 1361 (La.1987); South Central Bell Telephone v. Louisiana Public Serv. Comm'n, 352 So.2d 964 (La.1977). Finally, this Court has found that a decision of the Commission will not be overturned absent a finding that it is clearly erroneous or is unsupported by the record. Central La. Electr. Co. v. Louisiana Public Serv. Comm'n, 437 So.2d 278 (La.1983); White v. Louisiana Public Serv. Comm'n, 259 La. 363, 250 So.2d 368 (1971).
Gulf States, however, contends that the traditional standard of review applicable to appeals from Commission rate orders is not appropriate in this case. The company argues that the procedures employed by the Commission deprived Gulf States of its due process rights to a full and fair hearing and a decision based upon the evidence adduced at the hearing. Specifically, the company avers that the Commissioners did not hear any of the testimony or read any of the transcripts of the proceedings, and that the Hearing Examiner who did hear all of the testimony did not prepare any findings or conclusions which could have formed the basis of an independent, unbiased order. The company further maintains that the Commission made no findings at the time the order was issued, but rather, 42 days later, issued a "Majority Opinion" authored by the Commission's counsel and consultants who had acted as Gulf States' adversaries during the hearings. The company also contends that the Commission's counsel and consultant/witnesses inappropriately evaluated the credibility of witnesses and evidence in both the Majority Opinion and the Report of Special Counsel. Finally, Gulf States alleges that the Commission's consultants were unqualified to give opinions on the varied subjects on which they testified, ignored or were ignorant of evidence favorable to Gulf States, and employed computerized analyses that were susceptible to manipulation.
Gulf States concludes that as a result of these procedural deficiencies, the Commission's Order is not entitled to a presumption of validity, or to the deferential standard of review traditionally accorded its decisions. The utility argues that the correct standard of review is that found in LSA-R.S. 45:1192 and in the Louisiana Administrative Procedure Act, LSA-R.S. 49:964. The former provides that a court "may affirm ... change, modify, alter, or set aside, as justice may require" an order of the Commission. The latter states that the court may reverse or modify an order if, among other grounds, the decision is "made upon unlawful procedure."
The Commission is constitutionally required to "adopt and enforce reasonable rules, regulations, and procedures necessary for the discharge of its duties." La. Const. art. 4, § 21(B). Gulf States' argument that the Commission's order at issue was the result of unreasonable or "unlawful" procedure rests partly on the contention that the order deprives its shareholders of a property interest in violation of the Fifth and Fourteenth Amendments. The company maintains that a prudence inquiry involves substantial investor property rights, and that a finding of imprudence is tantamount to taking a portion of the plant for public purpose, without compensating the company or its investors. The existence of such a constitutionally protectable property interest triggers a substantive right of due process, which must provide the person whose interests are at stake an effective, efficient, and fair process. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The greater the substantive rights involved, the more closely the hearings must resemble a trial.
Gulf States also argues that because a prudence determination necessarily entails *79 the application of the "reasonable man" standard to a discrete investment decision in the past, requiring the weighing of relevant facts and circumstances, it most closely resembles a determination of negligence in a tort suit. The inquiry concerns "adjudicative facts," questions "of who did what, where, when, how, why, with what motive or intent," which should ordinarily not be decided without providing the parties an opportunity for trial. 1 K. Davis, Administrative Law Treatise, § 7.02 at 413 (1958). Thus in a prudence case, the utility contends, ratemaking loses its legislative nature and becomes a judicial function. In administrative law terms, the Commission's order is one of particular, rather than general applicability, and thus constitutes adjudication, rather than rulemaking. Gulf States asserts that it is is therefore entitled to the trial-like process required in an adjudicative proceeding, citing Londoner v. Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908) and Bi-Metallic Co. v. Colorado, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915).
We first address the argument that under administrative law principles, Gulf States was entitled to a hearing closely resembling a trial. It is true, of course, that ratemaking is often particular in its application, in that the regulatory authority must determine what rates a specific utility may charge, based on factors which are unique to that utility. However, the predominant weight of opinion views the ratemaking process as legislative, because it looks to the future and changes existing conditions by making a new rule that prescribes future patterns of conduct. The theory that rulemaking may be distinguished from adjudication on the basis of its future effect was first articulated by Justice Holmes in Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226-27, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908):
[The proper characterization of an agency's actions] depends not upon the character of the body but upon the character of the proceedings.... And it does not matter what inquiries may have been made as a preliminary to the legislative act. Most legislation is preceded by hearings and investigations. But the effect of the inquiry, and of the decision upon it, is determined by the nature of the act to which the inquiry and decision lead up.... The nature of the final act determines the nature of the previous inquiry. As the judge is bound to declare the law he must know or discover the facts that establish the law. So when the final act is legislative the decision which induces it cannot be judicial in the practical sense, although the questions considered might be the same that would arise in the trial of a case.
The U.S. Supreme Court has reaffirmed the Prentis mode of analysis, see District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 476-79, 103 S.Ct. 1303, 1311-13, 75 L.Ed.2d 206 (1983), and its conclusion that ratemaking is essentially a legislative function. See United States v. Jones, 336 U.S. 641, 652, 69 S.Ct. 787, 793, 93 L.Ed. 938 (1949); Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945). In the recent case of New Orleans Public Service v. New Orleans, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), the Court again reaffirmed the legislative nature of ratemaking. The Court found that the proceedings at issue, in which the New Orleans City Council determined that certain costs incurred by NOPSI in relation to Grand Gulf I nuclear plant could not be reimbursed through a rate increase, "were not judicial in nature." Id. 109 S.Ct. at 2519. See also American Telephone & Telegraph Co. v. Federal Communications Comm'n, 602 F.2d 401, 410 n. 48 (D.C.Cir.1979); Wilson & Co. v. United States, 335 F.2d 788, 797 (7th Cir.1964).
This Court has also confirmed the legislative nature of ratemaking, even in cases involving the rates of particular utilities. In the early case of McNeely v. Town of Vidalia, 157 La. 338, 102 So. 422 (1924), the Court reasoned that
since public utilities are for all practical purposes public necessities, and virtual monopolies, it follows that the rates fixed for such necessities are in effect a tax upon the public for such public service.... *80 The fixing of such rates is therefore essentially a legislative function...."
Id. 102 So. at 423 (emphasis in original). That conclusion has often been reiterated by the Court. See, e.g., Louisiana Power & Light Co. v. Louisiana Public Service Comm'n, 523 So.2d 850 (La.1988); South Central Bell Telephone Co. v. Louisiana Public Service Comm'n, 373 So.2d 478 (La. 1979); South Central Bell Telephone Co. v. Louisiana Public Service Comm'n, 352 So.2d 964 (La.1977).
Despite the legislative nature of ratemaking, however, it is also true that a prudence inquiry involves "adjudicative facts," which apply to and affect Gulf States specifically. The nature of the inquiry thus makes it appropriate for the Commission to hold an evidentiary hearing before making a determination of such significance to the company and its investors. See Patagonia Corp. v. Board of Governors of the Federal Reserve System, 517 F.2d 803 (9th Cir.1975); Appalachian Power Co. v. EPA, 477 F.2d 495 (4th Cir.1973); Schwartz, Administrative Law 204. Further, we agree with the company's assertion that the property interest at stake is one to which due process concerns protected by the federal and state constitutions attach, see Duquesne Light Co. v. Barasch, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989); South Central Bell Telephone Co. v. Louisiana Public Service Comm'n, 373 So.2d 478 (La.1979), and that the company is entitled to a hearing before being deprived of that interest. The issue thus becomes whether the kind of hearing provided by the Commission in this case violated Gulf States' due process rights. The U.S. Supreme Court has established a three part balancing test to determine what safeguards are necessary when a constitutionally protectable liberty or property interest is at stake. A reviewing court must weigh the interests of the affected individual, the risk of erroneous decision making based on the procedures used, and the government's interest in efficient resolution of the issues. Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
In this instance, in accordance with the Commission's normal procedure in rate cases, hearings were conducted before a Hearing Examiner rather than the Commission members themselves, although Commissioner Louis Lambert also had himself appointed as an Examiner and, along with the administrative aides of other Commissioners, attended many hearing sessions. The Commission engaged two firms of attorneys to represent it at the hearings, and later hired a third firm as lead counsel. It also employed as experts a utility consulting firm, a nuclear specialist, and an engineering firm with extensive experience in nuclear prudence cases. During 40 days of hearings, approximately 53 witnesses were called and cross-examined concerning their live as well as prefiled depositions and statements. Several thousand pages of transcript were compiled, and several hundred exhibits entered into evidence. At the end of the hearings a Report of Special Counsel, principally written by the Commission's consultants and special counsel, was presented to the Commission. The Report contained summaries of witnesses' testimony and recommendations as to the disposition of the prudence issue. Following submission of the Report, Gulf States sought and was granted the opportunity to argue the matter, and a full day hearing was conducted before the Commission. Finally, 42 days after the Commission adopted Order No. U-17272-C, it issued a Majority Opinion, the content of which relied heavily on the Report of Special Counsel.
Gulf States contends that this process was fatally flawed because the Commissioners did not hear the testimony, either in person or through a report of the Hearing Examiner, and because the decision process was delegated to adversarial witnesses who prepared the Commission's Order based on their own evaluations of opposing witnesses' testimony. However, as the district court noted, the cases cited by the company in support of its contention that the procedure employed by the Commission was not sufficiently "trial-like" are distinguishable from the present case.
*81 In Ohio Bell Telegraph Co. v. Public Utilities Comm'n, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937), on which Gulf States heavily relies, the Commission was called upon to value a telephone company's property in order to decide what amount to include in the company's rate base. Despite the submission of extensive evidence concerning the value of the property, the Commission determined its value by reference to certain journals and tax lists which it did not identify and which were not introduced into evidence. When the company sought the disclosure of the documents relied upon by the Commission, and an opportunity to rebut them, it was refused. The Court held, therefore, that the proceeding did not provide the fair hearing essential to due process.
In Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936), unlike the case at issue, the Secretary was required by statute to hold a "full hearing" before issuing rate orders. Although hearings were held before an examiner, the Secretary issued an order without having heard or read any of the evidence, and without having considered the briefs submitted by the plaintiff. The Court held that if "the one who determines the facts which underlie the order has not considered evidence or argument, it is obvious that the hearing [mandated by statute] has not been given." Id. at 480-81, 56 S.Ct. at 911.
In Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the issue before the Court was whether a state could terminate welfare payments without affording the recipient an opportunity for an evidentiary hearing prior to termination. The Court concluded that the stakes for the recipient were too high and the possibility for error too great to allow termination without giving the recipient a chance to be fully informed of the case against him and the opportunity to contest its basis and to produce evidence in rebuttal.
In Patagonia Corp. v. Board of Governors of the Federal Reserve System, 517 F.2d 803 (9th Cir.1975), the court found that when there are contested questions of adjudicative fact, the party which may be adversely affected is normally granted a hearing in which that party has "the opportunity to confront witnesses and to hear and contest the evidence against him." Id. at 816.
In KFC National Management Corp. v. N.L.R.B., 497 F.2d 298 (2d Cir.1974), the N.L.R.B. regional director had made an ex parte investigation into the plaintiff's allegation of an unfair labor practice, and had concluded that it had no merit. When the plaintiff then petitioned the Board for review, its petition was denied by the vote of a three member panel, two members of which had never considered the case but had given their assistants general authorization to vote in their places. The Second Circuit held that this complete delegation of the Board's statutory duty to decide the case constituted a "prima facie" demonstration of impropriety and allowed the court to inquire into the administrative process to insure that the decision-making was informed, unbiased, and personal.
In Carolina Power & Light Co. v. FERC, 716 F.2d 52 (D.C.Cir.1983), the Commission had issued an order refusing to allow the utility to pass along permanent disposal costs of spent nuclear fuel on the basis that reprocessing was a reasonably forseeable possibility. When the company petitioned for a rehearing to rebut the Commission's finding concerning the availability of reprocessing, FERC denied the application, stating only that the petition presented no matters of law or fact which it had not previously considered. The court held that the Commission had failed to set forth a clear presentation of its reasoning, making it impossible for the court to intelligently perform its reviewing function.
In this case, Gulf States clearly was provided an evidentiary hearing in which it had a full opportunity to learn the extent of the case against it and the basis for that case, to present witnesses and introduce documents in support of its position, and to cross-examine Commission witnesses. Nor was there an abdication by the Commission of its decision-making duties of the sort condemned by the court in KFC National Management Corp. v. N.L.R.B., supra. *82 Although the Commissioners did not personally hear all of the testimony, Commissioner Louis Lambert and representatives of the other Commissioners frequently attended the hearings. In addition, the Commissioners were provided with summaries of testimony which had been submitted previously to Gulf States for its review and approval of content. The company made no objection at that time to the use or the accuracy of the summaries. Further, although Gulf States now complains that the Commissioners neither heard all of the testimony nor read the transcript, it has not, in brief or oral argument, alleged to the district court or to this Court that the summaries were biased or misleading. Nor surely, given the volume of prefiled testimony, exhibits, and hearing transcript (the transcript alone numbered over 7,000 pages), could the company assert that the summaries were not helpful to the Commissioners in comprehending the complex, technical issues involved in the prudence inquiry.
Commission members also granted private audiences to company representatives, meetings which would clearly have been inappropriate in an adjudicative proceeding. Finally, in a departure from its usual procedure, following the submission of the report of special counsel, Gulf States was allowed to file exceptions to the report, and was granted a full day hearing before the full Commission to argue its case.
As Gulf States acknowledges, the Commission is permitted to delegate the hearing of oral testimony to an examiner, and the "sifting and analyzing" of the evidence to "competent subordinates." Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936). The company complains, however, that the Hearing Examiner, the one person who did hear all of the evidence in the case, failed to prepare a report on his findings of fact.[3] The Supreme Court has held that such a report is not essential to the validity of a hearing. Id. at 478, 56 S.Ct. at 910; see also N.L. R.B. v. MacKay Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). Gulf States also contends that it was denied due process on the basis that the Commission's Majority Opinion, which was not issued until 42 days after the Order, was authored by the Commission's consultants and counsel who had acted as the company's adversaries during the hearings. The Commission is statutorily permitted to retain special counsel, engineers, consultants, etc. to assist its economics and rate analysis division in "evaluating, reviewing, and representing the commission in matters affecting services and rates charged by public utilities to Louisiana consumers or the judicial review thereof." LSA-R.S. 45:1163.3. The company's contention that a violation of due process occurs when such staff members take an adversarial stance in hearings and then advise the Commission regarding its decision has been rejected by the federal courts.
In Wilson & Co. v. United States, 335 F.2d 788, 796 (7th Cir.1964), the court stated that
We hold that it was proper for members of the Commission's Common Carrier Bureau who were counsel of record in the hearing before the Commission to participate in the decisional process that led to the orders under review; and that this conduct did not violate section 3(a) of the Administrative Procedure Act, ... the Commission's own rules, as well as constitutional due process.
In American Telephone & Telegraph, 449 F.2d 439 (D.C.Cir.1979), the court observed that
The case law generally rejects the proposition that the combination of judicial and adversary functions is a denial of due process. This seems to be particularly true where the proceeding is rule making or rate making.
The Administrative Procedure Act is consistent with the jurisprudence on this issue. The Act specifically exempts proceedings *83 involving rates of public utilities from the separation of functions requirement imposed on adjudicatory proceedings. See 5 U.S.C. § 554(d); see also Seacoast Anti-Pollution League v. Costle, 572 F.2d 872 (1st Cir.1978) ("The decision ultimately reached is no less the Administrators (sic) simply because agency experts helped him to reach it."); 2 K. Davis, Administrative Law Treatise 84 (1958) ("The strength [of the administrative process] lies in staff work organized in such a way that the appropriate specialization is brought to bear upon each aspect of a single decision, the synthesis being provided by the men at the top.").
Further, it is standard agency practice for staff members to prepare the opinions adopted by the agency. While this practice has been the subject of criticism, it has been defended as necessitated by heavy administrative work loads. As one often cited scholar has observed,
The objection to the separation of deciding from opinion writing may be unanswerable except in terms of inevitability. No one has yet conceived a system which will dispose of the quantity of adjudication, without an undue diversity of results, and will at the same time permit the deciding officers to write their own opinions.... The best solution of the Board's problem is probably the one the Board has worked outthe use of assistants.
K. Davis, Administrative Law 239 (1972).
Nor has Gulf States made a persuasive showing that it has been disadvantaged because the Commission's Majority Opinion was not issued simultaneously with its Order. The purpose underlying the requirement that an agency must provide a statement of findings as to disputed issues and reasons for its determination is "to enable a reviewing court to determine with some measure of confidence whether or not the ratemaking authority, which still remains in the Commission, has been exercised in a manner which is not arbitrary, capricious or unreasonable." Central Louisiana Electric Co. v. Louisiana Public Service Comm'n, 437 So.2d 278, 279 (La. 1983).
The case cited by Gulf States to support its contention that the combination of prosecutorial and fact-finding functions in one person violates due process, Allen v. Louisiana State Board of Dentistry, 543 So.2d 908 (La.1989), is not comparable to a ratemaking proceeding. Allen involved the adjudication provisions of the Louisiana Administrative Procedure Act, not applicable here,[4] and concerned a quasi-criminal prosecution which resulted in the plaintiff's suspension from the practice of dentistry. Further, the plaintiff was given no notice of the ex parte participation of the prosecutor in the drafting of the Board's formal findings of fact and conclusions, and no opportunity to object to the findings and conclusions prior to their adoption by the Board. The Court also found that the Board adopted the prosecutor's draft verbatim, after a minimal review. In contrast, the Commission's Majority Opinion in the present case was not the "secret product of an advocate," as the court found in Allen. Gulf States had full knowledge of the participation of counsel and consultants in the drafting of the Special Report of Counsel, and was granted a full day of hearing to rebut its findings and conclusions before the Commission issued its order.
The U.S. Supreme Court set the permissible limits of judicial review of administrative decision making in the four Morgan cases. In the second of those cases, Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938), the Court held that it was "not the function of the court to probe the mental processes of the Secretary" of Agriculture. Id. at 18, 58 S.Ct. at 776. In the fourth case, United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941), the Court compared the administrative process to a judicial proceeding, and held that inquiry into the process by which either the judge or *84 administrator reached his conclusions would be destructive of the decision maker's responsibility.
The Second Circuit of Appeals has observed that
what emerges from the Morgan quartet is the principle that those legally responsible for a decision must in fact make it, but that their method of doing sotheir thought processes, their reliance on their staffsis largely beyond judicial scrutiny.
KFC National Management Corp. v. N.L. R.B., 497 F.2d 298, 304 (2d Cir.1974); see also N.L.R.B. v. Baldwin Locomotive Works, 128 F.2d 39, 47 (3d Cir.1942) ("[W]e may not tell the Board that it must `hear' in some one particular manner so long as it does `hear,' i.e., consider the evidence and argument.").
We find that the Commissioners did indeed "hear" and decide this case in accordance with their constitutional and statutory duty and with the due process requirements of an administrative hearing. Judicial inquiry into the methods by which they arrived at a decision is therefore at an end.
Having concluded that Gulf States' due process rights were not violated by the Commission's procedures, we turn to the standard of review to be applied to the issues remaining before us. The district court, noting that this Court has described the standard in a variety of ways, relied upon the standard articulated in the recent case of CTS Enterprises v. Louisiana Public Service Comm'n, 540 So.2d 275 (La. 1989): "a court will not upset the agency's finding unless it is based on an error of law or is one which the Commission could not have found reasonably from the evidence." Id. at 278. Although the Court in that case specified that the quoted standard applied in a common carrier setting, it is similar to our previous descriptions, cited above, of the standard to be applied in ratemaking cases. See, e.g., Louisiana Power & Light v. Louisiana Public Service Comm'n, 523 So.2d 850 (La.1988) (the inquiry is "whether the commission acted unreasonably or arbitrarily in setting rates for the utility"); Central Louisiana Electric Co. v. Louisiana Public Service Comm'n, 437 So.2d 278 (La.1983) (order will be upheld unless shown to be "arbitrary, capricious, abusive of its authority, clearly erroneous or unsupported by evidence").
We therefore apply the standard that Commission orders are to be upheld unless they are arbitrarily or capriciously rendered, or are not reasonably supported by the evidence.

II. PRUDENCE
Article 4, § 21 of the Louisiana Constitution grants the Public Service Commission the authority to regulate "all common carriers and public utilities" in the state. In the exercise of this authority, the Commission is charged with setting reasonable and just rules, regulations and orders. LSA-R.S. 45:1167. In order to carry out its constitutional and legislative mandates, the Commission is required to determine how much of a utility company's investment should be included in its rate base, ultimately to be borne by the ratepayers. In doing so, it must balance the interest of the ratepayers in the lowest possible rates, against that of the utility and its investors, who understandably desire the highest possible rates. Morehouse National Gas Co. v. Louisiana Public Service Comm'n, 245 La. 983, 162 So.2d 334 (1964). Although there is no single formulation sufficient to express constitutional, statutory, or judicially derived standards for determining how much of a utility's investment in a particular plant should be included within its rate base, see Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), one of the principles used by ratemaking bodies and courts to make such a determination is the prudent investment standard.[5] That standard *85 "essentially applies an analog of the common law negligence standard for determining whether to exclude value from rate base." Appeal of Conservation Law Foundation, 127 N.H. 606, 507 A.2d 652, 673 (1986). That is, the utility must demonstrate that it "went through a reasonable decision making process to arrive at a course of action and, given the facts as they were or should have been known at the time, responded in a reasonable manner." Re Cambridge Electric Light Co., 86 P.U.R.4th 574 (Mass.D.P.U.1987).[6]
Further, under the prudent investment rule, a utility is compensated for all prudent investments at their cost when made, irrespective of whether they are deemed necessary or beneficial in hindsight. Duquesne Light Co. v. Barasch, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). That is, the focus in a prudence inquiry is not whether a decision produced a favorable or unfavorable result, but rather, whether the process leading to the decision was a logical one, and whether the utility company reasonably relied on information and planning techniques known or knowable at the time. Metzenbaum v. Columbia Gas Transmission Corp., Opinion No. 25, 4 FERC 161,277. Although a prudence review is necessarily retrospective in that it involves an examination of past circumstances, past information available, and past decisions, these factors may not be evaluated in light of subsequent knowledge. Finally, the inquiry encompasses a public utility's continuation of an investment as well as its decision to enter into that investment, see Re Central Vermont Public Service Corp., 83 P.U.R.4th 532 (Vt. Pub.Serv.Bd.1987), and requires the utility to respond prudently to changing circumstances or new challenges that arise as a project progresses. In Re Long Island Lighting Co., 71 P.U.R.4th 262 (N.Y.Pub. Serv.Comm'n, 1985). 
Burden of Proof
Capital and other expenditures reflected in utilities' pro forma requests for rate increases are generally accepted by the Commission as appropriate and necessary, and therefore recoverable, expenses. In that sense, a utility's investments are presumed to be prudent and allowable. When, however, the Commission raises serious doubt about the prudence of a particular investment, a searching inquiry becomes necessary, and at that point, the burden shifts to the utility to prove that the expenditure was in fact necessary and appropriate, or resulted in no additional costs. See Union Electric Co., 40 F.E.R.C. 61,046 (FERC 1987); Long Island Lighting Co. v. Public Serv. Comm'n of New York, 134 A.D.2d 135, 523 N.Y.S.2d 615 (3d Dept. 1987); Re Central Vermont Pub. Serv. Comm'n Corp., 83 P.U.R.4th 532 (Vt.P.S. B.1987).

A. Public Service Commission's Position On Prudence

1. Load Forecasting and its Bearing on Prudence

In order to determine whether Gulf States' decision to restart River Bend in 1979 was reasonable, given the analytical tools and information available at the time, Kennedy & Associates, outside consultants employed by the Commission, performed an analysis of the planning process which led to the decision. Because a major thrust of Gulf States' argument is that at the time of the decision it was faced with an overwhelming *86 need for new generation sources, Stephen Baron of Kennedy & Associates first examined the company's load forecasting techniques to determine whether its forecasts, which were clearly too high in retrospect, were reasonable when made. He concluded that the techniques were inadequate, and led Gulf States to overestimate its need for generating capacity. More specifically, he found that the company's forecasting methods, which had produced consistently inaccurate load growth estimates even in one year forecasts, failed to adequately reflect the impact of price changes on the use of electricity. At a time when most utilities were using more sophisticated econometric models to measure the impact of economic factors on demand, Gulf States continued to rely on its traditional trending analyses, which were based on prior demand, and on interviews with large industrial customers.
In the summer of 1978, the company prepared a special peak demand forecast that assumed a peak annual demand growth of approximately 5.9%. However, the forecast ran only until 1984, a year prior to the projected commercial operation of River Bend. Estimates for subsequent years were projected by calculating the growth rate for the last years of the six year period and assuming that that rate would continue. According to Baron, this forecasting technique ignored price elasticity effects and made the unreasonable assumption that growth from existing customers would continue indefinitely. The Commission notes that the significance of price elasticity effects should have been apparent to the company because a corporate model run by Gulf States in 1979 predicted that from 1978 on, electricity prices would rise 5.99% annually, an increase substantially greater than the 1.5% rate of increase historically experienced by the company. The Commission also maintains that the inadequacy of the company's load growth forecasting techniques was acknowledged by the former president of Gulf States, Norman Lee, who testified that a consultant was brought in on an unofficial basis in 1978 "to teach us how to do it." Further, in 1979, a specially created company task force reported that Gulf States was the only utility studied which relied on trending and judgmental techniques to forecast load, and recommended a complete reevaluation of its forecasting process.
In addition, the Commission notes that many of the events relied upon by Gulf States to explain why it was facing an overwhelming and urgent need for greatly expanded generation at the time of the restart decision had occurred prior to the decision to suspend the project in 1977. Further, it strenuously argues that the company's contention that River Bend was critical to its ability to meet future service demand is contradicted by Gulf States' decision in August 1978 to sell the unit. At the time of that decision, the company was aware of the provisions of the Industrial Fuel Use Act, and of the unexpected jump in its load growth in 1977 and 1978. Yet, the Commission emphasizes, Gulf States undertook an extensive national and international marketing effort to sell River Bend, an effort which indicated that the company believed that it could better meet its load growth with other alternatives.

2. Generation Alternatives: Gulf States' Economic Studies

The consultants also reviewed Gulf States' analysis of alternatives to River Bend at the time of the restart decision. They found that virtually no analysis was made of the economic consequences of the options available in 1979, particularly in comparison to the thorough economic studies performed or commissioned by the company prior to the original decision to build River Bend. The earlier studies had compared the costs of the various alternatives over the life of the plants, including capital, operations, and fuel costs, and had concluded that the total cost of nuclear energy would be less than either coal or oil. In contrast, the consultants found that Gulf States performed no site-specific economic studies after 1974. The Commission argues that the major studies relied upon by the company are of construction costs, rather than of the cost of producing electricity *87 over the life of River Bend compared to other generating alternatives.
The Commission dismisses studies conducted in 1976, 1977, and 1978 alleged by Gulf States to have "reaffirmed that the nuclear option was the most economic." It notes that the 1976 study consists of four pages, two of which contain computations, and the other two of which chart the results of those computations. The Commission argues that the study does not relate specifically to River Bend, and uses a nuclear capital cost of $858 per kilowatt, which implies that a unit the size of River Bend could be built for $806 millionmore than $100 million less than the company's estimate for River Bend in September 1975, and nearly $1 billion less than its estimated cost in late 1978. The Commission describes the 1977 study as consisting of one page containing a list of numbers presumably designed to show mills per kilowatt hour for River Bend and for the Nelson coal units. It asserts that Gulf States has never provided a basis for determining the assumptions used to develop those numbers. The Commission further contends that the 1978 study, termed the "Restart Study" by Gulf States, was not an economic study, but rather an analysis of the financial impact of various planning alternatives. It argues that because the study covered only a ten year period, it obviously cannot be construed as an economic study of the life-cycle costs of River Bend, which had an estimated life of forty years, or of that of its alternatives.
Regarding the Federal Power Commission's 1978 study entitled "Nuclear vs. Coal Cost Comparison," the Commission argues that it is a backward-looking analysis of costs of plants already on line in 1975, and that the majority of the nuclear plants reviewed cost less than $100 million. Again, the study did not address the economics of River Bend or an alternative to that unit. The Commission further contends that Gulf States' reliance on a Nuclear Regulatory Commission study issued in December 1978 is undermined by the testimony of Norman Lee, the president of the company at the time of the restart decision, who acknowledged that he did not show the study to the Board, and knew that the capital cost assumptions reflected in it were well below the estimated cost of River Bend in 1979. The Commission also argues that the company's claim that this study reflected a consensus view in the industry on the economics of nuclear versus coal is contradicted by the fact that the nuclear industry cancelled more units than it started in 1977, 1978, and 1979. In 1978, there were thirteen cancellations and one start. In 1979, there were eight cancellations and one startRiver Bend, the last nuclear plant to be started anywhere in the country.
Finally, the Commission addresses testimony by company representatives that numerous comparative studies were performed during the period at issue. The Commission notes that on November 15, 1978, James Derr, a Gulf States planner, filed testimony before the Commission to show that River Bend would be economical. The comparative cost calculations were shown on one page of paper, which Mr. Lee later testified was typical of the many studies allegedly performed by Derr and other executives, and which he characterized as "back-of envelope" studies. The Commission argues that the Derr analysis, although it purported to be based on the total cost of River Bend, listed a cost per kilowatt of $1,400, or about $1.3 billion for the unit. Mr. Lee testified that in November of 1978, Gulf States knew that River Bend would cost about $1,800 per kilowatt, but that it was necessary to use the "official" estimate of the project's cost before the Commission.[7] The Commission concludes that the company was aware that *88 cost studies employing accurate estimates would not support the nuclear alternative.
The Commission contends that other documents reveal that the restart decision was motivated by Gulf States' desire to avoid a large write-off rather than by concern for the economic consequences to its ratepayers.[8] The company's top management met on August 1, 1978 to discuss "the most serious problem facing the companywhat to do about River Bend I." The minutes of that meeting disclose that there was an extensive discussion of the effects of cancelling the unit. Following this discussion, the Chairman, W. Donham Crawford, ruled out a write-off of the investment in River Bend, and concluded that the company was left with one option, "and that option is to build it." The Commission argues that, given the magnitude and the risk of the project that it was contemplating, Gulf States' failure to make any attempt to ascertain the Commission's position on a possible River Bend cancellation, and the company's cursory assumption that it would receive no rate relief for recovery of sunk costs if the unit was cancelled, were unreasonable. It notes, for example, that in 1978 or early 1979, Gulf States was allowed recovery and a return on its amortized investment in the cancelled Blue Hill coal units, as well as a return on the unamortized balance on those units. The Commission further contends that the company's decision to build the unit only if it could not be sold clearly was designed solely to preserve the value of the asset, and not to provide least cost energy. The Commission cites the company's selection of the option to sell as its first choice as evidence that Gulf States' management did not really believe nuclear to be the most economical alternative.

3. Generation Alternatives: Commission's Economic Studies

The Commission's consultants testified that although they had found the decision to restart River Bend to be imprudent, it was still necessary to determine whether there should be an imprudence disallowance, since even an imprudent planning process could lead to a beneficial economic result through fortuitous circumstances. Kennedy & Associates therefore analyzed what generation choice the company should have made, based on circumstances existing at the time, and whether that choice would have been beneficial compared to River Bend. An economic analyst employed by the firm, Randall Falkenberg, determined that one alternative had been a lignite plant, which Gulf States' expansion plans showed could be completed within the same time frame as River Bend. He thus performed a study comparing the option of completing River Bend against cancelling the unit and replacing it with a lignite plant. Employing least cost techniques and a computer model assertedly used by utilities during the relevant period, Mr. Falkenberg compared these alternatives over a range of variables and assumptions. He concluded that lignite had an economic advantage over nuclear of approximately $60 million a year, or more than $2 billion in total.[9]
In order to calculate the damages resulting from the company's restart decision, Kennedy & Associates determined the cost of a lignite unit the size of Gulf States' share of River Bend, to which they added the sunk and cancellation costs associated with River Bend, the cost of additional transmission facilities for a lignite unit, and the loss of tax benefits associated with the nuclear unit. As a result of these calculations, they recommended that $1.4 billion of *89 Gulf States' $3 billion investment[10] in River Bend be disallowed from the rate base as imprudent. That figure did not include the cost of the company's obligation to purchase electricity from Cajun's portion of the unit for five years or certain accounting order deferrals granted to Gulf States by the Commission in December 1986. Dr. Kennedy testified that had those costs been included, the total disallowance would have been as high as $2 billion.
Another consultant hired by the Commission, Charles Komanoff, also performed an analysis of the restart decision. He determined that Gulf States' management should have decided to build a coal-fired unit in 1979, particularly in light of the accident at the Three Mile Island Nuclear Plant in March of that year. The Commission argues that the accident, which involved an unprecedented degree of core damage and led to greatly expanded federal safety regulations, dramatically increased the financial risks involved with the construction of a nuclear plant. Mr. Komanoff testified that the anticipated increase in costs for River Bend as a result of the Three Mile Island accident should conservatively have been estimated at 25%. In response to the incident, Gulf States' Chairman, Mr. Crawford, requested a comprehensive analysis of its impact on River Bend. Five and one half weeks later, a committee chaired by Dr. Linn Draper issued a report consisting of a one and one half page memorandum with twenty pages of attachments. The report concluded that the nuclear accident at Three Mile Island would not significantly affect River Bend because of the dissimilarities in the types of reactors used in the two plants. No further reports were issued.[11] The Commission maintains that the company's response was inadequate in view of the severity of the accident.
Mr. Komanoff testified that Gulf States should also have been put on guard by the compelling evidence of adverse cost trends for nuclear plants under construction at that time. The estimated construction costs of such plants were escalating at the rate of approximately 22% a year. The Commission notes that the trend was evident in 1979 in respect to River Bendits estimated cost was six times higher at that time than it had been just eight years earlier in 1971. Mr. Komanoff also testified that empirical data was available to Gulf States in 1979 which showed that the current and prospective cost escalation of coal was less than that of nuclear. He recommended that a 2/3 imprudence disallowance be applied to the company's investment in River Bend, or a total of approximately $2 billion.

4. Public Service Commission's Order Regarding Prudence

The Commission adopted the recommendation of Kennedy & Associates to disallow $1.4 billion of the investment in River Bend. The Commission found that the actual negative economic effect of Gulf States' imprudence was $2 billion, but accepted the lower figure because its consultants had determined that this disallowance would allow the company to remain financially viable.

B. Gulf States' Position On Prudence
While it has taken issue with the Commission's finding of imprudence, Gulf States does not specifically ask in this appeal to have added to the rate base the disallowed portion of its River Bend investment.[12] However, the company argues that as long as the finding of imprudence remains, the threat of punitive rate treatment in the future exists in other regulatory *90 jurisdictions (presumably a reference to Texas where the merits of a $1.456 billion prudence disallowance are now pending), as well as in Louisiana. Further, Gulf States contends that the finding will continue to have an adverse impact on its financial statement, upon which its standing in the financial community is judged by future investors. It therefore seeks to have the Commission's finding of imprudence overturned for reasons discussed hereafter.

1. Load Forecasting: Need For New, Diversified Generation

Gulf States maintains that as a result of the beginning of federally-mandated gas curtailment, new restrictive federal regulations, and the Arab oil embargo, it was plunged in the early 1970s into a "new energy world," requiring immediate conversion of existing gas generating units to oil-burning capability; the prompt creation of a massive fuel procurement program; and the planning and construction of new generating facilities which burned neither natural gas nor fuel oil (because of concerns about both the expense and future availability of those two fuels). The company states that even before these events, it had taken steps to address fuel diversification concerns by commissioning studies evaluating nuclear and fossil generation in Louisiana. As a result of these studies, management decided in 1971 to build nuclear generating plants at River Bend. The company continued to evaluate its options, and by the mid 1970s, Gulf States included coal, nuclear, and lignite in its planning documents as sources of future generation.
The company's planning process was impacted by a significant downturn in its load growth during 1974-1976, caused by a national recession. Further, in January 1977, the Public Service Commission rejected Gulf States' application for a $23.8 million rate increase. The company therefore deferred construction of both the two Nelson coal units and River Bend. The company notes that the situation again changed dramatically, however, when its load growth increased 12% in 1977 and 10% in 1978. New internal growth projections of a 5.9% compound annual growth rate indicated a need for substantial amounts of additional capacity. Gulf States contends that this need was multiplied in 1978 by Congress' passage of the Fuel Use Act, which threatened it with the loss, by 1990, of its gasfired generation, or virtually all of the base load generation on its system. Gulf States contends that it was thus faced not only with a substantially increased load growth, but with the need to replace an entire generating system. In light of this "monumental and overwhelming situation," the company argues, the Commission's preoccupation with load forecasting technique and with one generating unit (River Bend) was unreasonable.
The company asserts that its forecasted need for significant additional generating capacity was confirmed by the Public Utilities Commission of Texas, which in 1978 granted Gulf States a Certificate of Convenience and Necessity for two River Bend units, and Nelson coal units 5 and 6. Assuming an annual load growth of 3.7% from 1979 to 1987, the Texas Commission found that without construction of all four plants, Gulf States would have a deficiency of 594,000 kilowatts in generating capacity by 1987. Gulf States also cites the Louisiana Public Service Commission's decision in December 1978 to grant the company rate relief to support its construction program. At that time the Commission noted "the possibility of inadequate reserve margins in the next few years in the absence of the addition of substantial generating capacity." Finally, the company refers to the National Electric Reliability Council Annual Review for 1978, 1979, and 1980. The 1978 Review's electric peak load projection for the period of 1978 to 1987 in the Southwest Power Pool Region, in which Gulf States is located, was 6.2%. The 1979 Review projected an average annual compound growth of approximately 6.1% for the period 1979 to 1988. Gulf States persuasively argues that these contemporaneous load projections, which were in line with its projection of a 5.9% load growth, should be the basis for determining whether its forecasts were reasonable, rather than Mr. Baron's after-the-fact analysis.
*91 Gulf States also responds to the Commission's criticism of its use of interviewing and trend extrapolation as load forecasting techniques. It cites a 1985 study titled "Selecting the Best Load Forecasting Techniques for Electric Utilities," which stated that in 1978, trend extrapolation was used by 25% of the nation's large utilities for forecasting residential loads, and by 32.7% of those companies to forecast commercial customer loads. The study also reported that 19.6% of the large utilities used the customer interview process to predict industrial load. Gulf States observes that even Mr. Baron's load forecasts indicated a need for two major generating units by 1985, without considering the impact of the Fuel Use Act.[13] The company asserts that the issue therefore was not whether to build an additional unit, but rather how many additional units to build.

2. Generation Alternatives: Gulf States' Economic Studies

Gulf States also argues that it pursued a well-reasoned analysis of generation alternatives to River Bend, and that the entire background of the project must be reviewed in order to place the 1979 restart decision in perspective. In 1968 the company received a report from Stone & Webster concerning possible locations for nuclear, gas, and coal generating plants. In 1970, it commissioned the same firm to evaluate the relative economics of nuclear and coal generation. After a thorough analysis, Stone & Webster concluded that the total cost of nuclear energy production would be less expensive than coal or oil. Studies performed in 1973 and 1974 by both Stone & Webster and Bechtel Corporation also found that nuclear had an economic advantage over the alternatives. That conclusion was further reinforced by a report issued in 1974 by the Atomic Energy Commission.
Gulf States maintains that it continued to evaluate the economics of the generation options throughout the period that the project was suspended, and that these evaluations reaffirmed the economic advantage of nuclear generation. It refers to a 1976 study entitled "Update Coal & Nuclear Power Plant Cost"; a 1978 Federal Power Commission study; an internally generated 1978 "Restart Study," which the company claims analyzed the comparative economics of nuclear and fossil fuel generation, as well as the financial impact of various options on the company, its ratepayers, and its stockholders; and testimony by company representatives that analyses comparing coal, nuclear, and lignite costs were "virtually constant." Mr. Lee testified that management was aware of studies showing that River Bend remained the most economic alternative up to a $2 billion total capital cost. Finally, Gulf States relies on a December 1978 study performed by the Nuclear Regulatory Commission which compared nuclear and coal costs for every region in the country, and concluded that nuclear would be less expensive. The company argues that this study confirmed both its own estimates and the February 1978 Federal Power Commission study.
Gulf States maintains that the Commission's criticism of its economic studies is unfounded. It disputes the Commission's contention that the comparative study presented to the Commission by its planner, James Derr, in November 1978, reflected a total cost for River Bend of $1,400 per kilowatt, when the utility knew at that time that the unit would cost about $1,800 per kilowatt. The company argues that in a study of whether it would be more economical to complete River Bend or to cancel it and construct an alternative plant, the costs already spent for the nuclear unit at the time of the analysis must be disregarded, since they must be counted as sunk costs in either case. It asserts that if those costs are ignored, the resulting capital cost of River Bend is very close to the $1,400 per kilowatt figure used by Mr. Derr.
Gulf States also addresses the Commission's conclusion that the 1979 "Restart Study" could not be used to compare the economic consequences of generation options. *92 The company contends that the study clearly showed that the completion of River Bend, with 40% participation being sold to another utility, was the best option for both the ratepayers and its own financial health.[14] The company argues that because sale of a portion of the plant tended to shift the economics in favor of nuclear, it could reasonably focus on non-economic factors, such as financial considerations and fuel diversity, in making the ultimate decisions on River Bend. It contends that given the uncertain energy environment facing the company at the time of the restart decision, it was not unreasonable to "hedge its bets" by diversifying the company's generation mix. It explains that all of its generation plans produced during the 1978-1979 time frame included coal, lignite, and nuclear for the maximum possible diversification.
Gulf States also emphasizes that there were numerous updated studies of River Bend's construction costs during this period. In 1977 it received a study of estimated costs from Stone & Webster. That estimate was evaluated by Management Analysis Company, which concluded that there was a 50% probability that the project would cost $1.5 billion and a 90% probability that it would cost $1.7 billion or less. The company's own engineering department arrived at a similar construction forecast. In 1978, Gulf States decided to rebid River Bend, and solicited bids from four national engineering/construction firms. An internal evaluation of the bids indicated a cost of approximately $1.7 billion, while Management Analysis Company independently evaluated the construction costs at $1.670 to $1.770 billion. In September 1979, Stone & Webster completed a definitive estimate which confirmed that River Bend would cost approximately $1.7 billion.
Gulf States further contends that it performed a detailed analysis of what effect the accident at Three Mile Island would likely have on River Bend's cost. It argues that because of the complete dissimilarity between the types of reactors used in the two units, it was reasonable to conclude that the accident would add no more than $25 to $50 million to River Bend's cost.

3. Generation Alternatives: The Commission's Economic Studies

Gulf States argues that the Commission's consultants' study of a lignite alternative to River Bend ignored several important factors. Among those cited are whether a new plant could have been financed if River Bend had been cancelled; the fact that Gulf States had entered into an agreement to participate in lignite units with Cajun Electric in north Louisiana; and the probability of acquiring sufficient lignite reserves in the time required. The company recites its unsuccessful efforts to obtain sufficient reserves before the restart decision.[15]
The company also challenges the Commission's finding that a lignite plant could have been constructed by 1985. It points to a 1978 study performed by the company's engineering department which concluded that a minimum of 7½ years would be required to select a site, obtain permits *93 and licenses, and construct a plant.[16] Finally, the company criticizes Mr. Falkenberg's analysis comparing the projected life-cycle costs of River Bend with those of a hypothetical lignite plant. It maintains that some of his input assumptions were incorrect, that he chose to rely only on certain of the numerous documents pertaining to lignite analyses in the company's files, and that he provided no justification for those numbers which he did use.[17]

C. The Attorney General's Position on Prudence
The Attorney General, on behalf of the State of Louisiana, contends that the amount of the investment in River Bend found to be imprudent by the Commission was too low. He first argues that had the Commission's consultants considered alternatives other than nuclear and lignite, they would have found coal to be even less expensive, and thus would have recommended a greater disallowance. He also maintains that the consultants erred in failing to calculate the full measure of damages caused by Gulf States' imprudence. Instead, Kennedy & Associates determined the maximum disallowance which, according to their calculations, Gulf States could absorb without becoming insolvent. The Attorney General argues that if disallowance of the total amount of damages would result in the company's insolvency, then an inquiry should have been conducted, for review by the Commission, concerning whether the reorganization of Gulf States under Chapter 11 of the Bankruptcy Code or a similar private plan was in the public interest or not. He contends that because inquiries concerning the total damages and the effect of insolvency were not made, the ratepayers did not receive an informed decision of the Commission, based on evidence in the record, which reflects a full disallowance for the effects of Gulf States' imprudence, as required by article IV, § 21 of the Louisiana Constitution.
Finally, the Attorney General argues that a finding of imprudence in the decision to build River Bend should have resulted in a disallowance of Gulf States' entire investment, except for the sunk costs and the reasonable cancellation costs that would have been incurred in 1979. He contends that any energy from the plant that the Commission found to be needed by the system under the "used and useful" test could then be paid for by the ratepayers at a cost the Commission determined to be just and reasonable.

FINDINGS AND CONCLUSIONS REGARDING PRUDENCE
After considering the contentions of the parties and the extensive record in this case, we have concluded that the Commission's order finding that Gulf States was imprudent to restart River Bend in *94 1979 is reasonably supported by the evidence, and is neither arbitrary nor capricious. The Commission's consultants presented sufficient credible evidence to raise a serious doubt about the prudence of the company's investment, and the Commission was not unreasonable in finding that Gulf States then failed to carry its burden of proving that the restart decision was prudent. While the evidence to support particular findings of imprudence is in some instances less than overwhelming (specifically, in regard to Gulf States' overestimation of future load growth in 1978-1979), there is clearly sufficient basis in the record to support the conclusion that the process leading to the restart decision was flawed, and that, given the information available at the time, prudent managers would not have chosen in 1979 to construct a nuclear power plant.
First, there is credible evidence that during the relevant time period Gulf States was aware that its forecasting methods, while not completely out of the mainstream of those used by other utilities, were unable to measure the impact of price increases on demand at a time when company analyses were predicting an unprecedented rise in prices. It was also not unreasonable for the Commission to conclude that a 1978 peak demand forecast, a critical forecast for the River Bend restart decision, was seriously flawed because it projected load growth only until 1984, one year prior to the anticipated commercial operation date of the unit.
Furthermore, Gulf States' principal argument regarding load growththat as a result of various factors, chiefly the Fuel Use Act of 1977, it faced an overwhelming need to build new and diversified generating plantsis contradicted by extensive evidence that even after the company was aware of the sudden increase in its load growth in 1978 and 1979 and of the provisions of the Fuel Use Act, it still decided in August 1978, as a first option, to attempt to sell the unit. It was only after this attempt was unsuccessful that management made the decision to build. In addition, there was testimony before the Commission that the replacement of River Bend with a lower priced lignite unit would have given Gulf States the financial capability to more easily diversify away from oil and gas.
There was also sufficient evidence for the Commission reasonably to find, as did the district court, that Gulf States' economic analysis of the options available in 1979 was inadequate. The studies performed or commissioned by the company in the early 1970s comparing the costs of the alternatives over the life of the plants were based on cost assumptions that clearly were outdated by 1979. Credible evidence was also presented showing that the later studies relied upon by Gulf States were deficient as side-by-side comparisons of the life-cycle costs of River Bend and the alternatives.[18] The lack of thorough economic studies is particularly significant given the magnitude of the investment being contemplated. As early as late 1979, when construction of River Bend was less than 8% complete, Gulf States' investment in the unit accounted for 68% of its common equity. In 1978, the investment was almost three times common equity. Thus continuation of River Bend's construction was, as a Gulf States' consultant expressed it in 1980, a "bet-your-company" decision. Finally, it was reasonable to infer from the fact that in testifying before the Commission Gulf States used the "official" estimated cost of the unit, rather than the higher actual estimated cost, that cost studies employing the *95 latter would not support the nuclear alternative.
In addition to the lack of site-specific economic studies supporting the company's contention that River Bend was the most economical alternative, the Commission was presented with persuasive evidence concerning factors which at the time of the restart decision or shortly thereafter signalled a significant increase in the financial risks associated with nuclear plants. These factors included a 22% annual increase in their estimated construction costs, a trend that was evident in River Bend's own history of cost escalation, and the accident at Three Mile Island, which at the least indicated the probability of more stringent regulatory requirements in the future and the continuation, if not acceleration, of adverse cost trends. There is also convincing evidence showing that the reaction within the industry to these factors was a dramatic downturn in nuclear plant starts, and a corresponding increase in cancellations, until in 1979 there were eight cancellations and no startsother than River Bend. Finally, the Commission was presented with the minutes of a Gulf States management meeting held on August 1, 1978, which strongly suggest that the company's primary concern at that time was not providing least cost energy to its ratepayers, or the diversification of its generation sources, but rather the avoidance of a write-off of its existing investment in River Bend at the expense of its shareholders.
In regard to the analysis performed by Commission consultants Kennedy & Associates, comparing the cost of River Bend to that of a lignite plant, there is contradictory testimony by the Commission and Gulf States concerning whether sufficient lignite reserves were available in the relevant time period, what the costs of acquiring available reserves and constructing plants would have been, and whether it would have been reasonable to assume that a lignite plant could have been built within the same time frame as River Bend. There were also charges by both sides that the other made selective use of available documents in deciding what input assumptions to use in its computer models, and that the results of those models are therefore subject to manipulation. As noted above, however, unless an order of the Commission is not reasonably supported by the evidence, the function of the court is not to reweigh and reevaluate the evidence or to substitute its judgment for that of the expert body constitutionally entrusted with the regulation of the matter. Southern Message Serv., Inc. v. Louisiana Public Serv. Comm'n, 426 So.2d 606 (La.1983). In this case, there is a sufficient basis in the record to support the Commission's conclusion that lignite was a viable and economically beneficial alternative to River Bend, and that a prudent public utility would have chosen it in preference to completing the nuclear plant.
Regarding the arguments of the Attorney General, it is true that public utility regulation does not insure that the business shall produce net revenues. Federal Power Comm `n v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). The Supreme Court decisions in Hope and the subsequent case of Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), have been construed to mean that there is no requirement that the end result of a ratemaking body's adjudication must be the setting of rates at a level that will guarantee the continued financial integrity of the utility. See, e.g., Kansas Gas & Elec. Co. v. State Corp. Comm'n, 239 Kan. 483, 720 P.2d 1063 (1986); Appeal of McCool, 128 N.H. 124, 514 A.2d 501 (1986); Pennsylvania Elec. v. Pennsylvania Pub. Util., 509 Pa. 324, 502 A.2d 130 (1985). However, it is also true that it is the Public Service Commission which is constitutionally accorded the authority to decide how the interests of ratepayers and the utility should be balanced in any given rate case. In the exercise of that authority, the Commission may, within its discretion, make a policy determination concerning whether the interests of the ratepayers are better served by disallowing the full damages flowing from a utility's imprudence, or by tempering the disallowance in order to maintain *96 the utility's solvency. See Appeal of McCool, 128 N.H. 124, 514 A.2d 501 (1986).
The Attorney General does not dispute the Commission's authority to make such a policy determination. Rather, he argues that because there was no inquiry concerning the total damages resulting from Gulf States' imprudence or the effects of its insolvency, the Commission had no factual basis on which to make such a determination in this case. The record reveals, however, that employees of Kennedy & Associates did testify regarding their estimates, albeit rough ones, of the total disallowance which would result if the Cajun buybacks and accounting deferrals (the two factors which the Commission chose to disregard in calculating the imprudence disallowance) were considered. In addition, Mr. Komanoff analyzed what the expected cost of an alternative coal plant would have been, and testified extensively on the full imprudence disallowance which he would recommend concerning Gulf States' investment in River Bend. As a result of this testimony, the Commission found that the full extent of the damages resulting from the company's imprudent decision was $2 billion. Further, there was testimony before the Commission, presented by witnesses on behalf of the Attorney General, concerning the possible beneficial effects of bankruptcy reorganization of utilities in general, and of Gulf States in particular. Given the evidence in the record, we find that the Commission could reasonably have concluded that consumer interests were better served by maintaining Gulf States in a position to provide a reliable supply of electric service than by resorting to the uncertainties of the bankruptcy court.
As noted above, the Attorney General alternatively argues that once the Commission found the decision to restart River Bend imprudent, the company's entire $3 billion investment in the plant, minus its sunk costs in the year 1979 and reasonable cancellation expenses, should have been disallowed. He contends that any energy needed by the Gulf States system under the "used and useful" test could then be paid for by system ratepayers at a rate determined by the Commission to be just and reasonable. Since the State explicitly expresses approval of the methodology used by the Commission's consultants, however, as well as their conclusion that a prudent utility planner would have opted to build a non-nuclear plant in 1979, it follows that the damages resulting from the decision to build River Bend should be measured as the difference between the cost of the nuclear unit and the cost of the prudent alternative, determined in this case (after adjustment to maintain Gulf States' solvency) to be $1.4 billion.
In conclusion, the Commission was presented with persuasive evidence that Gulf States was aware, in 1978 and 1979, of significant inadequacies in its forecasting methods; that, faced with a "bet-yourcompany" situation, the utility failed to perform side-by-side economic comparisons of generation alternatives prior to the restart decision; and that the company's first choice was to sell River Bend, belying its present claims that the nuclear unit was the most economical alternative and was critical to its ability to meet load demand. Additional evidence was presented regarding Gulf States' use of "official," rather than known actual (higher) estimated costs to justify its decision; its failure to take into account the 22% annual increase in nuclear plant construction costs, which had been well documented at the time of the restart decision and was reflected in River Bend's own history of cost escalation; and its significant underestimation of the effects of the Three Mile Island accident. Also offered into evidence were the minutes of an August 1, 1978 management meeting which strongly indicated that the company's primary concern was the avoidance of a large write off, rather than providing the lowest cost energy to its customers. In those minutes, Gulf States' chairman is quoted as stating that the company could not sell the unit"no one wants it" and that it was left with one option, "and that option is to build it." Finally, evidence was introduced reflecting a dramatic industry shift, from 1977 to 1979, away from nuclear plant starts, and toward cancellations. In view of these factors and the *97 other evidence presented to the Commission, we conclude that its finding of imprudence, and disallowance of $1.4 billion of Gulf States' investment in River Bend have a reasonable basis in the record, and are neither capricious nor arbitrary.

III. RATE BASE EXCLUSION PLAN
During the district court proceedings on the merits of the imprudence issue, testimony was presented by Gulf States regarding what it termed an "inventory plan." This plan was intended by the utility to resolve the controversy associated with the imprudence disallowance by providing a revenue source to support the portion of its River Bend investment excluded from the rate base.[19] Pursuant to LSA-R.S. 45:1194, the district court remanded the case to the Commission for consideration of this "inventory" plan, as well as other new evidence presented at trial in the district court. Following several months of meetings and communications between utility representatives and Commission consultants, the Commission issued Order No. U-17282-D. That order reaffirmed its earlier finding of imprudence, but also included a proposal for a plan somewhat similar to the inventory plan suggested by Gulf States. Under the Commission's proposal, which was termed a "rate base exclusion plan," an amount of capacity equivalent to the portion of the investment in River Bend excluded from the rate base would be treated as a deregulated asset. Ratepayers would guarantee the purchase of energy from the excluded capacity at 4.6 cents per kilowatt hour. The Commission would retain the right to approve off-system sales from the deregulated asset or the sale of the asset itself, or alternatively, to return all or a portion of the disallowed investment to the rate base. Sixty percent of the proceeds of off-system sales which should exceed 4.6 cents per kilowatt hour would be allocated to reduce rates paid by Gulf States' customers for the regulated portion of River Bend. In addition, the Commission would be entitled to obtain the benefits associated with any settlement reached by Gulf States with regulators in another jurisdiction (again, an apparent reference to Texas), which should prove more favorable than the rate base exclusion plan in reducing River Bend costs to ratepayers. The plan further obligated Gulf States to accept a return on equity of 12.75%. Finally, and most significantly, both parties were required to drop all pending appeals, notably Gulf States' appeal of the imprudence disallowance.
The Order, No. U-17282-D, stipulated that Gulf States accept or reject the proposed rate base exclusion plan within ten days. It further provided that if the company were to reject the plan, the findings and conclusions in the Commission's previous order, No. U-17282-C, which contained no ameliorative provision regarding the disallowed portion of the River Bend investment, would be reinstated. Gulf States notified the district court that it would not accept the Commission's plan,[20] and the case returned to that court for briefing and oral argument. In its decision rendered on October 11, 1989, the court thereupon upheld the Commission's imprudence disallowance of $1.4 billion, but also ordered the implementation of the rate base exclusion plan proposed by the Commission in Order No. U-17282-D.[21] The Commission and *98 Attorney General now ask this Court to reverse that portion of the judgment directing the implementation of the rate base exclusion plan, while Gulf States requests that the implementation order be affirmed after the deletion of certain of the plan's "punitive" provisions.
The Commission's appeal of the court's action relies on two main arguments. First, the Commission maintains that because it found $1.4 billion of Gulf States' investment to be imprudent, it was within its authority to exclude the entire investment from the rate base. See, e.g., In Re Long Island Lighting Co., 71 P.U.R. 4th 262 (N.Y.Pub.Serv.Comm'n, 1985); Philadelphia Electric Co. v. Pennsylvania Public Utility Comm'n, 114 Pa.Cmwlth. 22, 538 A.2d 98 (1988). The Commission further contends that it would also have been within its constitutional authority to adopt an alternative more favorable to the utility than complete exclusion if it found such an alternative to be in the best overall interests of the ratepayers. The Commission strenuously argues, however, that because it found exclusion of the entire imprudent investment to be the preferred disposition of the case, and the district court affirmed that decision, it was not within the court's discretion to impose an alternative which would in effect allow the utility to obtain a return on its imprudent investment and deny the ratepayers the benefit of the imprudence disallowance.
The Commission points out that its imprudence determination reflected a finding that Gulf States could have obtained capacity equivalent to its 70% share of River Bend's 940 megawatts, i.e., 658 megawatts, for $1.6 billion, rather than the $3 billion actually spent. In contrast, under the rate base exclusion plan, Gulf States is permitted to deregulate 47% of the megawatts dedicated to the service needs of Louisiana ratepayers, and to sell energy from that capacity to other customers for its own financial benefit. As a result, instead of receiving Louisiana's share of the 658 megawatts (approximately 318 megawatts) for its portion of the $1.6 billion found by the Commission to be prudently invested in River Bend (approximately $706 million), Louisiana ratepayers will receive only about 168 megawatts. Furthermore, despite Gulf States' claim that the plan will not lead to rate increases, the Commission argues that other capacity, for which ratepayers would bear the cost, may have to be built in the future to replace the deregulated asset. And, if the Commission allows the addition of the deregulated capacity to the rate base in the future, ratepayers would be forced to pay for it again at its net book value.
The Commission cites the case of South Central Bell Telephone Co. v. Louisiana Public Serv. Comm'n, 256 La. 497, 236 So.2d 813 (1970) for the proposition that it has exclusive jurisdiction to fix rates, and that courts are without power to fix or change rates until the Commission has acted. It also refers to Louisiana Power & Light Co. v. Louisiana Public Serv. Comm'n, 523 So.2d 850 (La.1988), in which this Court held that a court should not unilaterally choose among regulatory options constitutionally entrusted to the Commission. It further argues that circumstances, including the financial position of the utility, have changed since it offered the plan in 1988, and that such a plan may no longer be appropriate. Finally, the Commission notes that the district court judge himself expressed uncertainty about the propriety of his order implementing the plan.[22]
In its second line of argument, the Commission contends that because the rate base exclusion plan was offered in an effort to settle the entire litigation with Gulf States, its court-imposed implementation violates *99 legal principles designed to encourage settlement. Although the court acknowledged that the plan was part of an offer conditioned on dismissal of all litigation, it nevertheless characterized the plan as a "policy decision" of the Commission. The Commission argues that it was improper for a court to rely on a settlement offer as the basis for deciding a case. It notes that the offer clearly reflected litigation risk, and that while the proposal to allow a rate base exclusion plan, coupled with various conditions, may have been characterized as a policy decision, it did not reflect a conclusion that the plan, absent those conditions, constituted a policy that fairly balanced the interests of the utility and the ratepayers. Finally, the Commission contends that the court's action in effect penalized the party which was victorious on the underlying liability issue for making a compromise offer, a precedent that would deter future offers of settlement.
In his appeal, the Attorney General reiterates the argument that allowing any of Gulf States' imprudent investment to enter the rate base in the future would require the ratepayers to pay for the capacity twice. He contends that such an occurrence would amount to a "confiscation of the consumers' property." He therefore asks this Court to set aside the district court's order, and to direct the Commission not to implement a plan which includes placing any of the imprudent investment into the rate base.
Gulf States seeks to have the district court's order implementing the rate base exclusion plan affirmed, except for what it terms the "punitive portions" of that plan. It requests this Court to reverse the provisions requiring the allocation of 60% of off-system sales to the reduction of consumer rates, and granting the Commission the right to obtain the benefits of a more favorable settlement between the utility and regulators in another jurisdiction.
The utility first argues that the district court acted within its discretion in ordering the implementation of the plan. It cites La. Const. art. 4 § 21(E), which provides that a utility's right of appeal to the district court extends to "any action" of the Commission. The company contends that the Commission's offer, extended in a formal rate order after consideration of Gulf States' proposal and that of its own consultants, indicates that the Commission had determined the plan to be a reasonable rate proposal. As such, it constituted agency action under the constitution and was subject to judicial review. The utility notes that the district court recognized that the Commission's action reflected a policy judgment. It emphasizes that the Commission's offer was embodied in a final rate order, and is not analogous to a settlement proposal between a plaintiff and defendant in the context of ordinary litigation.
Gulf States next contends that the district court's modification of the proposed plan was also a matter within its discretion. It notes that once the Commission has exercised its initially exclusive jurisdiction, the grant of authority to the courts to review its action is extremely broad; LSA-R.S. 45:1192 empowers the district court to "change, modify, [or] alter" its orders "as justice may require." Further, the determination of what constitutes just and reasonable rates must be based on the facts and circumstances at the time of the rate proceeding. Louisiana Public Serv. Comm'n v. Southern Bell Telephone & Telegraph Co., 14 P.U.R.3d 146 (1956). Gulf States argues that the district court correctly determined that certain of the conditions imposed by the Commission on what was otherwise a just and reasonable proposal were unreasonable in view of the conditions existing at the time the offer was made. It contends that those conditions were so manifestly unreasonable that it had had no choice but to reject the plan.
Regarding the Commission's demand that the company drop all of its pending appeals, Gulf States notes that one such appeal concerned who would be responsible for funding a management audit of the company, an issue which had no bearing on the reasonableness of the rate base exclusion plan. Further, Gulf States contends that it could not afford to drop its appeal of the imprudence finding, because the Attorney General refused to dismiss his appeal *100 seeking to have the company's entire $3 billion River Bend investment, minus sunk and cancellation costs, excluded from the rate base. It argues that it could not risk losing an appeal on the disallowance issue, a possible eventuality which would jeopardize all or part of the $1.6 billion recovery permitted by the Commission, i.e., the prudent part of the River Bend investment.
Concerning the condition that would have required it to accept a 12.75% return on equity, Gulf States notes that the Commission's own consultants had recommended a 14% return, a recommendation affirmed as reasonable by the district court. The company argues that acceptance of the lower rate of return would have exposed it to financial ruin. Gulf States concludes that the district court was fully within its authority when it ordered the implementation of the rate base exclusion plan, (except for certain assertedly unreasonable features), as necessary to meet the ends of justice.

FINDINGS AND CONCLUSIONS REGARDING THE RATE BASE EXCLUSION PLAN
After considering the record of the proceeding, the evidentiary submissions of the parties, and the governing statutes and constitutional provisions, we conclude that the district court overstepped the bounds of its discretionary authority in ordering the implementation of the rate base exclusion plan. Once it had determined that the imprudence disallowance was supported by the record and was a reasonable disposition of the case by the Commission, acting within its constitutional and statutory authority, it was not the prerogative of the court to offset the effect of that determination in an effort to improve the financial position of the utility. Such a decision rests solely within the province of the regulatory agency. Although courts are statutorily permitted to "change, modify, alter, or ... set ... aside [orders of the Commission], as justice may require," LSA-R.S. 45:1192, that statutory standard of review may not supercede or abrogate the constitutional scheme in which plenary ratemaking authority is delegated to the Public Service Commission. See La. Const. art. 4, § 21; South Central Bell Telephone v. Louisiana Public Serv. Comm'n, 340 So.2d 1300 (1976) (under the constitution, the Commission has exclusive jurisdiction in the first instance to fix or change any rate to be charged by a public utility, and courts are without power to fix or change any rate until the Commission has acted). The Commission's primary ratemaking authority was acknowledged in Louisiana Power & Light v. Louisiana Pub. Serv. Comm'n, 523 So.2d 850 (La. 1988), in which this Court, although finding that the Commission's failure to establish some kind of deferral plan was unreasonable, held that the district court usurped the Commission's constitutionally protected ratemaking authority when it chose one of the options open to the Commission. Here, the district court chose an option when, because its substantive finding of imprudence had been upheld, the Commission was not required to adopt any ameliorative provision.
Nor can we agree with the district court's characterization of the rate base exclusion plan, standing alone, as a policy decision of the Commission. Although the plan was presented in a rate order, it was clearly part of a larger settlement offer which included the dismissal of all appeals and the utility's acceptance of a 12.75% return on equity. As the Commission argues, such an offer necessarily takes into account litigation costs and risks, in the absence of which it might well not have been made.
This is not to say that Gulf States is not at liberty to file anew with the Commission for rate relief, or that the Commission may not on its own motion choose to review the effects of its rate order.[23] If, in the future, the Commission should determine that prevailing economic realities, in conjunction with the rate order now under review, have *101 placed the utility at serious financial risk[24] with potential adverse (and unacceptable) consequences for its ratepayers and shareholders, it would then be the Commission's responsibility to balance the appropriate interests involved in order to arrive at a proper solution.[25]
The aforestated reasons prompt our conclusion that the district court erred when it directed the Commission to implement a rate base exclusion plan.

88-CA-0709

IV. RATE OF RETURN ON EQUITY
As related above, Gulf States acknowledged that adding the full cost of its River Bend investment to the rate base would be an insupportable burden to its ratepayers. It therefore proposed a phase-in plan for recovery of those costs over several years. In Order No. U-17282-C, the Commission adopted a similar phase-in plan for the addition of the prudent portion of the investment to the rate base, although the order did not specify the exact amounts to be deferred in each year or the timing of the recovery of those amounts. In addition, the order granted Gulf States a 12% return on equity[26] and a first year rate increase of $63 million, despite a recommendation by the Commission's consultants that the company be granted a 14% return on equity and a first year increase of $92 million. As a basis for the Commission's decision to allow only 12% return on equity, the order cited the Federal Energy Regulatory Commission's "benchmark,"[27] which at that time was 12.23%, and recent Louisiana cases in which the Commission had allowed rates of return on equity ranging from 11% to 13.5%. Gulf States sought injunctive relief from the order in the 19th judicial district, whereupon Judge William Brown issued a preliminary injunction granting the company a $92 million first year rate increase and a 14% return on equity, and implementing a specific phase-in plan that provided for rate increases in four subsequent annual installments. The Commission is now appealing that part of the district court's decision which increased the rate of return on equity to 14%.[28] It contends *102 that the court's erroneous ruling resulted in approximately $20 million in excess revenue collected by Gulf States from February 18, 1988 to March 1, 1989, when the Commission granted the utility an increase in its rate of return for the second year of the phase-in plan ordered by the district court.[29]

A. Public Service Commission's Position on Rate of Return
The Commission first argues that its 12% rate of return on equity was reasonable because it approximated the rate of return that Gulf States would require if it had not been imprudent. It contends that its decision reflects a determination that a utility's imprudence should not be permitted to trigger an offsetting recovery in its rate of return on equity, based on the increased risk resulting from its imprudence. The Commission asserts that such a determination is particularly appropriate in this case because it had already directly addressed the utility's risk in tempering its imprudence disallowance by $600 million (disallowing $1.4 billion rather than $2 billion). In addition, in setting rates for Gulf States, it had used a hypothetical capital structure with a 40% equity ratio, rather than the company's actual equity ratio of 35%. The Commission explains that the use of this hypothetical capital structure had the effect of offsetting some of Gulf States' special risk and increasing its actual return on equity to 12.9%.[30]
The Commission refers to testimony by both its own consultants, Dr. Jay Kennedy and Lane Kollen, and Gulf States' expert, Dr. Charles Olson, that their respective recommendations concerning rate of return on equity were heavily influenced by the special risk presented by the utility,[31] a risk that resulted in part from its decision to restart River Bend. The Commission contends that the higher rates of return recommended by these consultants would reward Gulf States for its own imprudence. It further argues that its ruling reflects a fair balance of investor and ratepayer interests, and that under Louisiana law, it has broad authority to use its expertise and judgment in establishing a rate of return on equity for a regulated utility. It notes that in the case of Louisiana Power & Light Co. v. Louisiana Public Serv. Comm'n, 523 So.2d 850 (La.1988), this Court upheld the Commission's finding that a 12% rate of return on equity was reasonable, despite the opinions of expert witnesses that a higher rate of return should have been granted. The Commission argues that although its decision deviated from the recommendations of experts in this case, that decision was reasonable in light of the evidence they presented. Dr. Kennedy testified that rates of return for utilities without special risks were falling in the 11.25 to *103 12% range, and cited the FERC benchmark as illustrative of that point. The Commission contends that it could reasonably choose to allow a rate of return at the high end of the range generally allowed utilities at the time, one consistent with recent allowances in Louisiana, rather than rewarding Gulf States for risk resulting from its own improper actions.
The Commission also argues that a 2% increase in the rate of return on equity is not the type of ruling that should be made in an injunction proceeding. It reasons that the district court did not rule that a 12% rate was confiscatory, and that therefore the increase was the kind of fine tuning that should occur only after plenary review. The Commission cites cases involving rate increases in which this Court has found injunctive relief to be inappropriate if the rate granted was not confiscatory,[32] and contends that the principles embodied in those cases as they relate to requests for rate increases have been recently upheld in South Central Bell Telephone Co. v. Louisiana Public Serv. Comm'n, 555 So.2d 1370 (La.1990).[33] Finally, the Commission contends that if indeed it was necessary to grant Gulf States a $92 million rate increase in the first year to avoid a financial crisis, the district court could have accomplished its objective without disturbing the rate of return on equity, simply by increasing the first year rate relief and adjusting downward the required deferral.

B. Attorney General's Position on Rate of Return
The Attorney General also asks that the increase in return on equity be set aside, albeit on different grounds. He notes that demands for injunctive protection have become a regular feature of appeals by Louisiana utilities from rate orders of the Public Service Commission. The Attorney General ascribes this trend to the fact that the utilities bear the burden of "regulatory lag"; that is, if the reviewing process ends in a determination that the rate authorized by the Commission was too low, the utility will have lost the opportunity, during the period of review, to charge the higher rate that should have been authorized. He notes that courts and commissions normally do not protect utilities from the effect of regulatory lag because, in combination with the policy against retroactive ratemaking, it provides an incentive for efficient management.[34] He argues, however, that these tools are crude and inefficient, and deny the Commission and courts the flexibility to recognize the unusual circumstances that would in fact justify an allowance to offset past deficiencies or excesses of earnings. He urges this Court to restore that flexibility by allowing departures from the prohibition against retroactive ratemaking when it is warranted following a full plenary review. He concludes that were the Court to do so, the problem presented by frequent utility requests for injunctive relief would be largely resolved. The Attorney General therefore asks that we reverse the district court in finding that injunctive relief was appropriate, and remand to the Commission with instructions as to the recalculation of rates charged under the injunction and orders to make any adjustments necessary to provide earnings *104 which are fair to both the utility and its customers.

C. Gulf States' Position on Rate of Return
In its argument in support of Judge Brown's injunctive order, Gulf States first notes that the ruling was consistent with the testimony of both the Commission's and the company's consultants. It emphasizes that the Commission's expert, Dr. Kennedy, unequivocally denied that Gulf States was comparable to the utilities on which the FERC benchmark of 11.3% was based. Dr. Kennedy also stated that "it would not be appropriate for an investor to invest in Gulf States if you said that its prospect was for ... a 12% rate of return."
The utility also argues that, given its precarious financial condition in mid-1987, there is nothing in the record that even remotely suggests that a 12% return on equity was appropriate. Instead, the company contends, on the same day that the Commission decided the rate case, granting it a 12% rate of return on equity, Commissioner Lambert handed the Commission Secretary a document entitled "FERC benchmark return on equity report." It notes that this report was never made a part of the record, which at that time had been closed for two months, and was never identified or sponsored as an exhibit by any party or witness during the hearings before the Commission. Copies of the report were not circulated to the parties or other Commissioners, and no questions were asked concerning it or its contents. Gulf States argues that it was therefore afforded no opportunity to contest the document's applicability to the company's actual cost of capital. It contends that a decision based on a "surprise document," which was never entered into evidence, and which was contradicted by the testimony of the Commission's own expert witnesses, amounts to a complete deprivation of the company's due process rights.
Gulf States maintains that its position is analagous to that of the utility in South Central Bell Telephone Co. v. Louisiana Public Serv. Comm'n, 555 So.2d 1370 (La. 1990). In that case, this Court upheld the district court's injunction order on the basis that 1) the utility had a reasonable chance of prevailing on the merits of a 14% rate of return, given the Commission's violation of due process in its decision to impose a lower rate; 2) in view of the prohibition against retroactive ratemaking, the utility would suffer an irretrievable loss of millions of dollars; 3) the ratepayers were protected by their right to a refund;[35] and 4) the rate to be changed had been in effect for several years. Gulf States maintains that, in view of the Commission's violation of its due process rights, it too has a reasonable possibility of prevailing on the merits of the increase in rate of return; it would have irretrievably lost $1.7 million per month if no injunction had issued; its ratepayers are protected by the constitutional refund provision; and a 14% return on equity (on pre-River Bend rates) had been in place for at least two years before the Commission adopted the 12% rate of return here.
Finally, Gulf States contends that, by its very terms, the FERC benchmark is inapplicable to this case. The report's guidelines state that it is "advisory only." Further, the report expressly provides that one of the conditions which will result in exclusion of a utility from its survey is a decrease or omission of a common dividend payment in the current or prior three quarters. Gulf States notes that it has been financially unable to pay a common dividend since June 1986, or even to meet its contractual obligations on its preferred stock since December 1986.

FINDINGS AND CONCLUSIONS REGARDING RATE OF RETURN
After a careful review of the record, the district court's reasons for judgment, *105 the governing constitutional and statutory provisions, and the relevant jurisprudence, we conclude that the district court erred in increasing the utility's rate of return on equity from 12% to 14% in this injunction proceeding. As noted above, under article 4, section 21, of the Louisiana Constitution, the Public Service Commission has exclusive jurisdiction in the first instance to fix or change any rate to be charged by a public utility. It is well established in our jurisprudence that absent a showing of confiscation of property in violation of federal due process or state constitutional guarantees, courts should not afford interim injunctive relief from the Commission's rate determinations in rate increase cases. South Cent. Bell Tel. Co. v. Louisiana Pub. Serv. Com'n, 555 So.2d 1370 (La.1990);[36]South Cent. Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n, 340 So.2d 1300 (La.1976); South Cent. Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n, 256 La. 497, 236 So.2d 813 (1970).[37]
The issue before a court in an injunction proceeding regarding rates, therefore, is not whether the Commission has failed to set valid rates and charges, or whether the rates set are likely to be adjusted upward after full judicial review. The latter inquiry would require a judicial evaluation of the merits of the rate increase, in advance of the full and orderly appellate review contemplated by our state constitution. Rather, the sole issue for judicial determination is whether a continued imposition of those rates has been indisputably shown to constitute confiscation of a utility's property. South Central Bell, 340 So.2d 1300 (La.1976).
Since a rate order of the Commission will be disturbed on appeal when it is shown to be unreasonable, arbitrary, or capricious, a claim that such an order is confiscatory and therefore warrants injunctive relief, must necessarily meet an even higher standard of proof. That is, to be confiscatory, an order must not only fall outside of the Commission's wide discretionary authority, but also beyond the constitutional bounds of fairness and equity. The seminal case of Federal Power Comm'n v. Hope Natural Gas, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), is often cited for its articulation of the investor interests which should be accommodated in a rate order:
[T]he return to the equity owner should be commensurate with return on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.
*106 The Hope decision also made clear, however, that these legitimate investor interests are to be balanced against the interest of the ratepayers in non-exploitive rates, and that there are conditions under which a return on equity that would not meet the enumerated investor interests would be permissible.
In a later case, In Re Permian Basin Rate Cases, 390 U.S. 747, 770, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312, the Court, citing Hope, stated:
There can be no constitutional objection if the Commission, in its calculation of rates, takes fully into account the various interests which Congress has required it to reconcile.... [S]uch rates... intended "to balanc[e] ... the investor and consumer interests," are constitutionally permissible. FPC v. Hope Natural Gas Co., supra [320 U.S.] at 603 [64 S.Ct. at 288.]
In Gulf State Utilities Co. v. Louisiana Public Service Comm'n, 364 So.2d 1266, 1272 (La.1978), this Court stated that in reviewing the Commission's orders,
the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors. (quoting In Re Permian Basin Rate Cases, 390 U.S. at 791-92, 88 S.Ct. at 1372-73).
See also Jersey Central Power & Light Co. v. FERC, 810 F.2d 1168 (D.C.Cir.1987) ("Thus it is that a taking occurs ... when the balance between investor and ratepayer intereststhe very function of utility regulationis struck unjustly.") (Starr, J., concurring); Pennsylvania Electric Co. v. Pennsylvania Public Utility Comm'n, 509 Pa. 324, 502 A.2d 130 (1985); J. Tomain & J. Hickey, Jr., Energy Law & Policy 195 (1989).
Thus, to determine that, in this case, the Commission's order granting a 12% return on equity constituted confiscation of Gulf States' property, we would have to find that it was the result of deliberations in which the Commission failed to consider the legitimate interests of the utility and its investors in a higher rate of return, and to weigh those interests against the competing concerns of the ratepayers. No such finding was made by the district court. Nor do we find so here.
While it is true that both Gulf States' and the Commission's consultants recommended a higher rate of return based on their perceptions of the utility's special risk, it is also true that "a regulatory body such as the Commission is entitled to use its own judgment in evaluating evidence concerning a matter within its own expertise, and is not bound even by uncontradicted opinion testimony of experts." South Central Bell Telephone Co. v. Louisiana Public Service Comm'n, 373 So.2d 478, 486 (La.1979) (citing Baton Rouge Water Works Co. v. Louisiana Public Service Comm'n, 342 So.2d 609 (La.1977). In this case the Commission has chosen to accord Gulf States a rate of return which does not reflect the extra risk it faces as a result of its own imprudence. Under the circumstances, we cannot say that this decision reflects the kind of constitutionally unreasonable balance between investor and ratepayer interests which would justify the exceptional remedy of interlocutory injunctive relief.
In regard to the Attorney General's argument urging us to modify the judicial policy prohibiting retroactive ratemaking, we find no compelling reason to change the jurisprudence, recently reaffirmed by this Court,[38] on that issue.

DECREE
For the reasons set forth, the district court judgment in No. 90-CA-0445 upholding *107 Order No. U-17282-C of the Public Service Commission, which found Gulf States' 1979 decision to restart River Bend to have been imprudent, and which disallowed $1.4 billion of the utility's investment in the nuclear plant, is affirmed.[39] That part of the court's judgment ordering the implementation of a rate base exclusion plan is reversed and set aside. The judgment of the district court in No. 88-CA-0709 which granted a preliminary injunction increasing Gulf States' rate of return on equity from 12% to 14% during the first year of the phase-in plan is also reversed and set aside. The Commission will determine the appropriate time and manner in which the ratepayers will be reimbursed for the excess revenues collected by Gulf States as a result of the improper injunctive order.
AFFIRMED IN PART; REVERSED IN PART.
LEMMON, J., concurs and will assign reasons.
DENNIS, J., dissents in part, concurs in part and assigns reasons.
COLE, J., dissents and assigns reasons.
DENNIS, Justice, dissenting in part and concurring in part.
I respectfully dissent from the majority opinion and decree insofar as it affirms the Commission's imprudence disallowance. In my opinion, the public service commission, the district court and the majority of this court failed to recognize the constitutional limits and overtones of the "prudent investment" or "historical cost" rule. Consequently, the commission did not apply the rule correctly and consistently. For the same reason, my brethren did not scrutinize the issue closely as a constitutional and judicial question and failed to correct the legal errors committed by the regulatory agency.
The United States and Louisiana Constitutions protect utilities from being limited to a charge for their property serving the public which is so unjust as to be confiscatory. Duquesne Light Co. v. Barasch, 488 U.S. 299, 306, 109 S.Ct. 609, 615, 102 L.Ed.2d 646, 657 (1989); Covington & Lexington Turnpike Road Co. v. Sandford, 164 U.S. 578, 598, 17 S.Ct. 198, 205-206, 41 L.Ed. 560 (1896); FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 585, 62 S.Ct. 736, 742, 86 L.Ed. 1037 (1942); FPC v. *108 Texaco, Inc., 417 U.S. 380, 391-392, 94 S.Ct. 2315, 2392, 41 L.Ed.2d 141 (1974). If the rate does not afford sufficient compensation, the state has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments, Id.; as well as Article I, § 4 of the 1974 Louisiana Constitution.
One valid basis for calculating the amount of capital upon which investors are entitled to earn a fair return is the "historical cost" or "prudent investment" precept. Under this rule, a utility is compensated for all prudent investments at their actual cost when made (their "historical" cost), irrespective of whether individual investments are deemed necessary or beneficial in hindsight. Duquesne Light Co. v. Barasch, 109 S.Ct. at 616; FPC v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).
Although no single ratemaking methodology, such as the prudent investment rule, is mandated by the constitution, which looks to the consequences a governmental authority produces rather than the techniques it employs, Duquesne Light Co. v. Barasch, supra, it is clear that when a state regulatory agency uses the prudent investor rule to exclude a company's investment from its rate base and thus deprive it from earning a fair return thereon, questions of whether the agency has applied the rule fairly, consistently and properly are issues having constitutional overtones that ought to be scrutinized closely by a reviewing court. See Duquesne Light Co. v. Barasch, 109 S.Ct. at 617 ("[W]hether a particular rate is `unjust' or `unreasonable' will depend to some extent on what is a fair rate of return given the risks under a particular rate-setting system, and on the amount of capital upon which the investors are entitled to earn that return. At the margins, these questions have constitutional overtones."); see also Id. at 620 ("[W]hile `prudent investment' ... need not be taken into account as such in ratemaking formulas, it may need to be taken into account in assessing the constitutionality of the particular consequences produced by those formulas. We cannot determine whether the payments a utility has been allowed to collect constitute a fair return on investment, and thus whether the government's action is confiscatory, unless we agree upon what the relevant `investment' is. For that purpose, all prudently incurred investment may well have to be counted.") (Scalia, J., concurring).
The question of imprudence presented by this case is one of the most serious and the most controversial regulatory issues that this court and the public service commission have ever confronted. Its disposition will affect the company and the customers who rely upon its energy service for decades to come. Moreover, this decision will impact all other regulated public services and the state's economy in both the short and long term. The issue is extremely complex and important.
Prudence is an old regulatory concept being put to new use. The frequency of use of the concept by state utility regulatory commissions has increased greatly in the last 10 years. The immediate occasion for most recent uses of prudence has been the turmoil in the electric utility industry: construction cost overruns in completed plants, abandonment of plants, and excess capacity. The Prudent Investment Test In The 1980s, p. iii, The National Regulatory Institute (1985).
Recent public discussions of prudence have often loosely referred to "the prudence of a nuclear power plant" or the "prudence of a cost overrun," as if an object or a cost were prudent or imprudent. In proper legal analysis, however, prudence always relates to a decisionor the absence of a decision where one is needed such as a decision to construct a nuclear unit, to abandon a coal unit, or to use certain construction management practices. Id.
Review of the Supreme Court decisions and the recent state commission applications of the prudence standard suggests four guidelines for fair and coherent use of the prudent investment test. First, there is a presumption that each investment decision by a utility was prudent. The presumption of prudence can be overcome, *109 however, by substantial evidence creating a serious doubt about the prudence of the investment decision. Second, if the presumption is overcome, the question presented to the regulatory commission is whether the utility's investment decision was reasonable in light of all conditions and circumstances which were known or which reasonably should have been known at the time the decision was made. Id. at 58; Re Boston Edison Co., 46 P.U.R. 4th 431 (Mass. DPU, 1982). Third, a corrollary to the standard of reasonableness under the circumstances is a proscription against the use of hindsight in determining prudence. It is fundamentally incorrect for a commission to supplement the reasonableness standard for prudence with other standards that look at the final outcome of a utility's decision, though consideration of outcome may legitimately be considered as evidence in determining whether the presumption of prudence has been overcome. Fourth, the determination of prudence must be based on a retrospective, factual inquiry. The evidence should be retrospective in that it must be concerned with the time at which the utility made the decision in question. The evidence must tend to prove factual circumstances, not mere opinions, relevant to whether a reasonable decisionmaker would have viewed the utility's choice as imprudent at the time it was made. The Prudent Investment Test in the 1980s, supra at 58; See Duquesne Light Co. v. Barasch, 488 U.S. 299, 109 S.Ct. 609, 616, 102 L.Ed.2d 646 (1989) ("Under the prudent investment rule, the utility is compensated for all prudent investments at their actual cost when made (their "historical" cost), irrespective of whether individual investments are deemed necessary or beneficial in hindsight.")
The public service commission concluded that the company was imprudent in its decision to restart the River Bend 1 nuclear unit in early 1979; that the company should have instead constructed a lignite coal unit which would have resulted in lower costs to ratepayers. The commission's conclusions were based on findings by its staff that: the load forecasting process employed by Gulf States during the restart period was unreasonable, unreliable and inaccurate; the company's economic and financial evaluations were flawed and unreliable; the staff's experts forecast a significantly lower growth rate of energy load or demand than that projected by the company; the staff's experts concluded that units using scrubbed and unscrubbed lignite were viable options to restarting the Riverbend nuclear unit; one of these experts, using a least-cost evaluation technique, concluded that a lignite fueled-fossil unit would have been the best economic choice. Consequently, the commission calculated that the additional cost of building the nuclear unit instead of a lignite unit required it to assess an imprudence disallowance of $1.4 billion against the company and to exclude this part of the company's investment from the rate base.
In my opinion, the commission fell into serious legal errors in its application of the prudent investment rule that may have resulted in a confiscatory and unconstitutional taking of the company's property. Although the commission, for the most part, stated the rule correctly in its opinion, it disregarded the cardinal principles of the rule and proceeded to make its determination of imprudence in a confused and undisciplined manner. Essentially, the commission erred when it failed to: (1) recognize that the burden of proof rests with the commission, staff, or other interested party to show that the utility's decision should not be presumed to be prudent and to require that the prudence of an investment decision should not be examined until the presumption of prudence is rebutted; (2) judge whether the investment decision was imprudent on the basis of an objective test of whether any prudent utility manager could have made the same decision under the circumstances, rather than basing it substantially on the errors, omissions or deficient techniques of the company's managers; and (3) correctly apply the prudent investment test, rather than a test of whether the optimal or least-cost strategy was followed, thus losing sight of the fact that the commission's function is not necessarily to require that the "best" investment *110 decisions be made and that the commission is required to distinguish between the lessthan-optimal investment decision that still may be prudent and the truly imprudent investment decision. See The Prudent Investment Test In The 1980s, supra at 93-96.
The first error is easily demonstrated. The commission's opinion is devoid of any suggestion that it accorded a presumption of prudence to the company's investment decision. Instead, the commission appears to have done just the opposite by assuming that restarting River Bend 1 in 1979 was imprudent and then setting out to prove it.
The second error is also clearly evident from the commission's opinion. The first subject the commission addressed in its opinion with respect to prudence was its staff's review of the company's planning process in arriving at its decision to restart River Bend 1. The commission apparently considered this to be the most important factor indicating imprudence. In this portion of the opinion, the company's planning process is taken to task for a number of errors, omissions and inadequacies. But the mere fact that Gulf State's techniques or methods were deficient does not mean necessarily that any prudent utility planner charged with the knowledge of a reasonably competent manager would have decided against restarting River Bend 1. Indeed, Gulf State's alleged failings are simply not relevant to a determination of whether any reasonable or prudent manager would have decided to invest in River Bend 1 in early 1979, which, in essence, was the only prudence question before the commission. As the commission itself recognized later in its opinion, "the decision may still have been the right one, given the facts known or knowable within the context of the circumstances [making it] therefore necessary for the Staff to independently reconstruct a prudent planning process within the ... restart decision period to determine whether the decision to restart River Bend 1 was reasonable despite the Company's deficient planning process."
The Commission's third major error stems from a confusion of its function as a regulatory agency in making a prudence determination with the role of a utility planner in making a "least-cost" evaluation to choose the "best" investment decision. In its opinion, the Commission relied on its staff's reconstruction of facts known and knowable at the time the company made the investment decision in question. Regarding load forecasting, the staff reported that one expert had forecast a growth rate from 1978 to 1985 significantly lower than that which the company had projected in 1978; that this projected a difference in load for 1985 of 850mw, a difference greater than the company's share of the River Bend 1 unit. But other than this spare statement the Commission does not explain how the expert's retrospective forecast indicates imprudence rather than less-thanoptimal investment. With respect to generation expansion, the staff reported that two experts had each concluded separately that a particular type of lignite unit would have been a "viable alternative" to restarting River Bend 1 in early 1979. Again, however, the Commission fails to articulate any reasons why the existence of other "viable options" necessarily indicates that the company's investment decision was imprudent or even less-than-optimal. In the area of economic and financial analysis, the staff employed a consultant who utilized a "Risk Analysis Model", apparently a least-cost evaluation technique, to conclude that "a reasonable man, employing known economic assumptions and levelized busbar cost techniques, would have expected a lignite unit to cost much less to own and operate than a nuclear plant [and that] the levelized expected annual cost of the lignite unit was $484 million compared to $548 million for River Bend 1, an annual difference of $64 million." Or, as the Commission concluded, "the lignite unit was the lower cost option." For the third time, however, the Commission failed to indicate how the record factual evidence as explained by the expert's opinion shows that the company's investment decision was so bad that it would not have been made by any reasonable decisionmaker, rather than simply suggesting that hypothetically a different decision would have been better or optimal. In *111 fact, the Commission expressly finds in its opinion that the expert's testimony indicates only that replacement of River Bend 1 with "a lignite unit was the more reasonable and appropriate choice to meet [the company's] long term generation requirements." This and the other findings, and apparently all of the evidence of record, fall short of a convincing showing that no prudent manager would have made the investment decision to restart River Bend 1 in early 1979.
There is a reasonable possibility that any of these errors could have skewed the Commission's prudence determination, and it is substantially certain that the combination of all three errors prejudicially distorted the agency's decision. Furthermore, none of the errors can be disregarded, because each played a crucial part in the Commission's decision. The agency's disregard of its burden of overcoming the presumption that the investment was prudent allowed the Commission to begin the prudence inquiry without showing that it was properly called for. After improperly commencing and conducting the inquiry, the Commission expressly relied on both its irrelevant finding of company fault in planning and the experts' finding that the investment was less desirable than other viable options, in tandem, as a basis for concluding that the investment decision was imprudent.
In reality, the rule actually applied in this case bears little resemblance to the "prudent investment" rule. Perhaps a an apt descriptive title for the rule actually applied by the Commission would be the "successful investment" rule. For, in actual operation, the Commission's rule is that if the company makes an unsuccessful investment, it enjoys no presumption of prudence as a shield or a threshhold to raise against a prudence inquiry, and the company's investment will be disallowed as imprudent if the Commission finds significant fault with its planning techniques and if it can be shown that the company could have made a better investment decision. In effect, the commission's approach is little different from determining "whether individual investments are deemed necessary or beneficial in hindsight," an inquiry expressly eschewed by the prudent investment rule. See Duquesne Light Co. v. Barasch, 109 S.Ct. at 616.
The combination of legal errors resulting in the Commission's misapplication of the prudent investment rule requires that this court reverse the Commission's prudence disallowance and remand the case to that agency for a new determination of that question following correct principles of law. When there is warrant in the record and a valid basis in law for the Commission's determination, this court should give due deference to the agency's decision. But when the agency's decision is based on legal error, as in this case, its determination is due no deference and should be reversed. For it is exclusively the prerogative of the courts to say what the law means, and the Commission is required to obey the law.
I respectfully suggest that my colleagues in the majority and on the district court have given undue and misguided deference to the Commission's determination that the company's investment decision was imprudent. They have disregarded the Commission's legal errors made in misapplying the prudent investment rule that appear plain on the face of the agency's opinion. Further, they have gone beyond the findings made by the Commission in its opinion to search for evidence in the record to reinforce an administrative determination fraught with legal error. In effect, my colleagues have inadvertently reversed roles with the Commission: the agency is allowed to say what the law is and how it should be applied while the court is relegated to the task of reviewing the record, weighing the evidence and articulating the reasons to justify the imprudence disallowance.
I agree that more than ordinary scrutiny should be given the record by the court in this case, but not for the purposes to which it has been applied by my brethren. When a regulatory agency excludes a utility's investment from the rate base as having been made imprudently, thus depriving it of any return thereon, there is cause to be *112 concerned that the state in effect may have taken property without due process and adequate compensation. Accordingly, because of the constitutional overtones of a prudence disallowance, which always presents the risk that due process limits may have been exceeded, a reviewing court ought to scrutinize the record closely to ascertain whether a constitutional violation has occurred. Moreover, although a court should never substitute its judgment for the Commission's on whether a particular investment decision was prudent, courts are generally more competent to review prudence disallowances than many other regualtory determinations. The "prudent or reasonable man" concept is applied by the courts everyday in many complex areas of the law. For example, in negligence, products liability, mineral rights, trusts, and estate management cases judges are continually called upon to decide whether persons making complicated and difficult decisions have done so within the range of prudence or reasonableness. See The Prudent Investment Test In The 1980s, supra at iii, 39. A judicial review of the prudence determination in a public utility case, as in other legal fields, requires the court to contemplate only the broad gauge question of whether any reasonable or prudent manager could have made the investment decision in question. The prudence determination and the review of it do not require the depth of knowledge, acumen or perfection in decision as do many other regulatory decisions, such as fixing the rate of return, the cost of capital, the cost of debt, the cost of preferred stock, the cost of common stock and others.
I am very concerned about the company's protest that it was denied due process of law in that the elected commissioners did not see to it that the actual evidence in the case be made available to them but chose to receive only summaries prepared by trial counsel adverse to the company. At the present time I am under the impression that the majority opinion is correct that the company did not object to the manner of the hearing, including use of the summaries by the commission, but acquiesced therein, that any impropriety was further ameliorated by the commissioners' reliance on non-adversarial law-clerk type assistants to attend and report to them on the hearings, and that much of the record consisted of prefiled testimony which was available to the commissioners. If I am mistaken about the nature of the hearing or the company's acquiescence therein I look forward to being informed of my error in the inevitable application for rehearing. On the other hand, I do not agree with the majority opinion's suggestion that the company was not entitled to a trial type hearing or its equivalent on the imprudence disallowance simply because this is a regulatory rate case.
In all other respects I concur in the majority opinion.
COLE, Justice, dissenting.
I respectfully dissent from the majority opinion. Insofar as it affirms the Commission's imprudence disallowance, I dissent for the reasons expressed by Justice Dennis. The Commission indeed "disregarded the cardinal principles of the [prudent investment] rule and proceeded to make its determination of imprudence in a confused and undisciplined manner." Opinion of Dennis, J., dissenting in part and concurring in part at 107.
Moreover, I am gravely concerned about the cavalier manner in which the Commission jettisoned the presumptively prudent[1] business decision to restart River Bend I. "The potential misuse of the broader legislative and administrative authority to set lower utility rates is especially worrisome because government figures often use utility ratemaking for political purposes."[2] Drobak, From Turnpike to Nuclear Power; The Constitutional Limits on Utility Rate Regulation, 65 B.U.L.Rev. 65, 125 (1985). Despite the populist allure of the *113 Commission's decision, it should be remembered that
[h]arm to the investor interest, which will benefit consumers in the short run, can cause even greater long-term harm to the public. Excessively low utility rates can make obtaining new capital prohibitively expensive, they can induce utilities to defer needed construction projects until the utilities receive adequate assurances that investors will not bear most of the risks, and low rates can lead to a decrease in the quality of the utilities' services.
Drobak, supra, at 124-25.
The Commission is bound to obey the law as interpreted by this Court. However, the Commission's decision was derived through a process fraught with legal error. Its determination, therefore, is not due the deference accorded by the majority. That deference is compelled only when the record justifies it and there is a valid basis in law for the Commission's decision. As Justice Dennis has demonstrated, neither existed in this case.
I am further troubled by the lack of due process accorded Gulf States by the Commission. The Commissioners did not hear personally all the testimony. The actual evidence in the case was not made available to them; rather, they relied upon summaries prepared by trial counsel adverse to Gulf States. The majority sweeps aside these procedural deficiencies, noting that one Commissioner and representatives of the other Commissioners frequently attended the hearings and that Gulf States made no objection "at that time" to the use or the accuracy of the summaries. One could scarcely deem this to be the sort of impartial decision-making envisioned by the ratifiers of the Fourteenth Amendment.
"In the civil area, the [Supreme] Court [of the United States] has said that `[w]e do not presume acquiescence in the loss of fundamental rights[.]'" Fuentes v. Shevin, 407 U.S. 67, 94 n. 31, 92 S.Ct. 1983, 2001 n. 31, 32 L.Ed.2d 556 (1972) (quoting Ohio Bell Tel. Co. v. Public Utilities Comm'n, 301 U.S. 292, 307, 57 S.Ct. 724, 731, 81 L.Ed. 1093 (1937)). "Indeed, in the civil no less than the criminal area, `courts indulge every reasonable presumption against waiver.'" Fuentes, 407 U.S. at 94 n. 31, 92 S.Ct. 2001 n. 31 (quoting Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393, 57 S.Ct. 809, 812, 81 L.Ed. 1177 (1937)). As a general proposition, constructive consent is not a doctrine commonly associated with the surrender of constitutional rights. Cf. Edelman v. Jordan, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974) (state's constructive consent to suit in federal court).
As courts are properly loath to imply waivers of constitutional rights, I cannot agree with the suggestion of the majority that Gulf States impliedly waived its rights in this proceeding. The cloak of protection of the due process clause of the Fourteenth Amendment is not so threadbare as to leave Gulf States to the whim and caprice of a governmental body whose interests are perhaps at odds with its own.
Because the Commission failed to accord Gulf States the process it was due, and because the Commission erred grievously in concluding Gulf States acted imprudently when it decided to restart River Bend I in 1979, I dissent.
NOTES
[1] Gulf States originally intended to build two River Bend units, but cancelled the second unit in 1984. The Commission initially disallowed the company's investment in that unit under the "used and useful" test. See Order No. U-17282-C. On remand from the district court, however, it granted a full recovery of the unit's sunk cost over ten years, but without a return on the investment during that period. See Order No. U-17282-D.
[2] River Bend capacity is divided between Gulf States' Louisiana and Texas ratepayers. Therefore, although the Commission disallowed $1.4 billion of Gulf States' investment in the unit as imprudent, it is only the Louisiana portion of that amount, or approximately $677 million, which would be excluded from its rate base in this state. Gulf States also applied to the Public Utility Commission of Texas for a rate increase to support the portion of River Bend allocated to its Texas customers. That Commission, after extensive hearings, found that the evidence was inadequate to support a finding of either prudence or imprudence in regard to $1.453 billion of Gulf States' investment in River Bend, and reserved the right to reexamine the prudence of those costs in a subsequent proceeding. Gulf States appealed the order and simultaneously initiated a new proceeding before the Commission on the prudence issue. The Coalition of Cities for Affordable Utility Rates also appealed, and obtained from the trial court a permanent injunction prohibiting the Commission from reexamining that issue. The injunction was upheld by the Supreme Court of Texas in the recent decision of Coalition of Cities For Affordable Utility Rates v. Public Utility Commission of Texas, 798 S.W.2d 560 (Tex.1990). The Court found that by stating that Gulf States had failed to prove the prudence of $1.453 of its River Bend investment, the Commission had effectively disallowed that amount from the rate base, and that the doctrines of res judicata and collateral estoppel precluded the Commission from relitigating the issue. The consolidated administrative appeal of the Commission's order by Gulf States and the Coalition is now pending in the 250th District Court of Travis County, TX.
[3] The procedure employed in this case, in which a Hearing Examiner presided over the proceedings and compiled the evidence, but did not issue a preliminary decision, is typical of the procedure used by the Commission in all major rate cases, including the last six rate cases filed by Gulf States.
[4] See Louisiana Consumers League, Inc. v. Louisiana Public Service Comm'n, 351 So.2d 128 (La.1977).
[5] The prudent investment standard was articulated in Justice Brandeis' seminal dissent in Southwestern Bell Telephone Co. v. Public Service Comm'n, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981 (1923). Although the standard has been used by regulators to a much greater extent in the years following 1974, particularly in evaluating nuclear power plants, the concept has been long established in Louisiana jurisprudence, see Morehouse National Gas Co. v. Louisiana Public Serv. Comm'n, 245 La. 983, 162 So.2d 334 (1964), as well as in other jurisdictions. See, e.g., In Re Consolidated Edison Co., 73 P.U. R.3d 417 (N.Y.Pub.Serv.Comm'n 1968); Waukesha Gas & Elec. Co. v. Railroad Comm'n, 181 Wis. 281, 194 N.W. 846 (1923).
[6] The principle of prudence has developed in part to counterbalance the monopoly power of public utilities. As one Public Service Commission has observed: "If a competitive enterprise tried to impose on its customers costs from imprudent actions, the customers could take their business to a more efficient provider. A utility's ratepayers have no such choice. A utility's motivation to act prudently arises from the prospect that imprudent costs may be disallowed." In Re Long Island Lighting Co., 71 P.U.R. 4th 262 (N.Y.Pub.Serv.Comm'n 1985); see also Smartt, The Prudent Investment Test Examined, Pub.Util.Fort., July 25, 1985, at 5.
[7] The Commission notes that this was not the only occasion on which Gulf States did not disclose to the Commission the actual estimated cost of River Bend. On July 24, 1980, the Chairman, Mr. Crawford, testified before the Commission. At that time, the company had estimates showing that the unit would likely cost $2.154 billion, and knew that increases in its estimated cost had been averaging $42.5 million a month. In his testimony, however, Mr. Crawford used only the "official" figure of $1.729 billion.
[8] The company estimated that it had already invested $300 million in River Bend, and would have approximately another $100 million in cancellation costs. After an adjustment for tax benefits, it predicted that its write-off would be close to $200 million. At that point, common equity in the company was roughly $500 million.
[9] The Commission also notes that in response to criticism that his assumptions were inappropriate for Gulf States, Falkenberg performed a second study using information supplied by the company's own planners. He performed two analyses, one for early 1979, when the restart decision was made, and one for September 1979, the approximate time that structural concrete was poured. His first analysis reflected a $60 million annual benefit for a lignite plant; the second analysis showed an economic advantage of $90 million per year for lignite.
[10] Although Gulf States' total investment in River Bend was approximately $3 billion, that amount is shared by the Louisiana and Texas retail jurisdictions. Louisiana's portion of the investment is slightly less than half.
[11] Dr. Draper testified that he did not "recall specifically drafting a report giving an analysis of changes occasioned by Three Mile Island."
[12] As discussed in the next section of this opinion, the district court's order implementing a rate base exclusion plan in large part offset the adverse economic effects that the company would otherwise experience as a result of the disallowance.
[13] The company notes that Mr. Baron's projection of a 1984 peak demand of 6,776 MW was within 2.5% of Gulf States' prediction of 6,950 MW, and that Gulf States' forecasting error was 26.9%, while Mr. Baron's was 23.8%, a difference of only 3%.
[14] Although Gulf States' planning documents reflect the sale of a 40% participation in River Bend, the company was able to sell only 30% (to Cajun). The company maintains, however, that the consultants' analyses consistently ignored the economic and financial effect of selling a participation in the unit. It claims that merely assuming the sale of a 30% participation would have resulted in a $53 million annual savings to Gulf States over the life of the plant. The utility notes that Mr. Falkenberg testified that the lignite option had only a $60 million annual economic advantage over nuclear.
[15] Lignite reserves acquired by Gulf States in the mid 1970s turned out to be insufficient or located in areas which could not be mined. In 1978, the Brazos deposit in Texas, the largest and most economical available at the time, was determined to be unmineable because of its location in a flood plain. Gulf States next focused on reserves held by Phillips Coal Company and Shell Oil Company in Texas as the best remaining option. As a result of the prices quoted by those companies, however, as well as their insistence that there be future price adjustments tied to the price of oil and gas, the company concluded that this option was not economical.
[16] Witnesses for Gulf States testified that in 1978-1979 the company's management doubted whether a lignite plant could be brought into commercial operation as fast as River Bend. There was also testimony that company generation plans produced during this period showing lignite plants coming on line in less than 7 years were intended to be used only for economic comparison purposes, and did not mean that the company had concluded that a plant could have been constructed in that time frame.
[17] Gulf States contends that Falkenberg's 1985 base fuel costs were predicated on one year's data from plants operated by Texas Utilities Electric Co., and assumed that future costs of mining lignite would not rise faster than the rate of inflation, whereas Texas Utilities' fuel costs at each of the plants studied had actually risen between 19% and 27% a year. Dr. Pleatsikas, an economics expert testifying on behalf of Gulf States, stated that plugging the range of lignite costs projected by the Commission's own lignite expert, Kenneth Watkins, into Falkenberg's analysis would change its result to one favoring the completion of River Bend. The company further asserts that he dismissed sitespecific engineering studies of lignite costs, and provided no justification for the numbers used in his analysis. David Beekman, a witness for Gulf States, testified that simply modifying one of Falkenberg's input assumptions concerning lignite fuel cost, lignite heat rate, lignite capital cost, or nuclear capital cost by as little as 5%, causes the results of his model to switch to favor the nuclear option. Gulf States argues that no finding of imprudence can be based upon a 5% difference in various cost assumptions when projecting thirty years into the future.
[18] The company appears to place particular emphasis on the 1978 "Restart Study" and the Nuclear Regulatory Commission study issued in the same year. The former, while providing some relevant comparative data, patently was not an analysis of costs over River Bend's estimated forty-year life cycle, versus those of its alternatives. Further, there was testimony from Gulf States' own witness, Norman Lee, that the capital cost assumptions used in the latter study were far lower than the known estimated cost of River Bend in 1979. Regarding the testimony by Gulf States witnesses that frequent levelized comparative studies were performed, it was not unreasonable for the Commission to discount studies whose assumptions and results it had no way of objectively evaluating.
[19] The company asserted two purposes in offering the inventory plan. On one hand, the plan would avoid the "rate shock" which the utility's ratepayers would suffer if the entire investment were to be added to the rate base at one time. On the other hand, the plan would benefit the company financially by reducing the amount of write-off which would result from an imprudence disallowance.
[20] Gulf States asserted that its rejection of the plan was based on the Attorney General's refusal to dismiss his appeal on behalf of the State seeking to have the entire River Bend investment, other than sunk and cancellation costs, excluded from the rate base.
[21] The court stated:

In this regard the Court notes and invokes its authority pursuant to LSA-R.S. 45 Part V PSC, Section 1191, to change, modify, alter or reverse a COMMISSION order as the ends of justice will best be served by ordering the COMMISSION to implement and enforce its proposed deregulated asset plan in a manner not inconsistent with the views expressed herein.
The Commission contends that it is not clear from the district court's decision which terms of the rate base exclusion plan proposed by the Commission are to be implemented. The plan not only called for the dismissal of all appeals, but also for Gulf States' acceptance of a 12.75% return on equity, neither of which occurred.
[22] During oral argument on an application for rehearing, the judge stated that "the court realizes it may have have overstepped its bounds," and that "I am fairly convinced at the moment that is an error on the court's part."
[23] In this regard, counsel suggested in oral argument that the Commission would be receptive to reconsideration of whether some form of the rate base exclusion plan offered earlier would be in the best interests of both Gulf States and its ratepayers.
[24] The company has expressed concern that the imprudence disallowance will hinder its access to the capital markets. The Commission's consultants, on the other hand, gave their opinion that Gulf States can remain financially viable with a $1.4 billion disallowance, even in the absence of a deregulated asset plan.
[25] Because it is the Commission that is constitutionally assigned the task of balancing consumer and utility interests, we decline to instruct the Commission not to adopt a plan which includes the possibility of returning the disallowed investment to the rate base in the future, a position urged by the Attorney General.
[26] The rate of return on common equity, determined by the return required to sell stock on reasonable terms in the market, is one component of a utility's cost of capital, which is in turn the basis for calculating an overall "fair rate of return" for that company. The other components are the cost of its debt, determined essentially by the annual interest requirements of the utility's bonds and the interest due on its short term debt, such as commercial paper or lines of credit from banks; and the cost of its preferred stock, governed basically by the dividend requirement on each stock. South Central Bell Telephone Co. v. Louisiana Public Service Comm'n, 352 So.2d 964 (La.1977). Although the cost of the company's long-term debt and preferred stock are fixed, and therefore subject to empirical verification, the cost of common equity is not fixed, since it reflects what an investor perceives as his level of risk. Louisiana Power & Light Co. v. Louisiana Public Service Comm'n, 523 So.2d 850 (La.1988). In this case, the only dispute concerns Gulf States' cost of common equity.
[27] The "FERC benchmark" is an estimate of the nationwide average cost of common equity for public utilities.
[28] Notwithstanding its opposition to the courtordered increase in the rate of return, the Commission is not challenging the first-year rate increase of $92 million or the rest of the phasein plan adopted by Judge Brown. It suggests that although the plan improperly advanced the collection of some River Bend costs to the first year of the phase-in, the overcollection in the first year is offset by lower rate requirements in later years. Further, although Gulf States presented new evidence at the injunction hearing, a circumstance that would normally require a remand to the Commission for consideration of the evidence, see LSA-R.S. 45:1194, the Commission waived its right to a remand in this case, and thus that issue is not before us. It is the Commission's position, however, that the evidence received before the district court, even if assumed to be true, does not so alter the facts as to establish an unconstitutional confiscation.
[29] On March 1, 1989, the Commission granted Gulf States a 13% rate of return on equity for the second period of the phase-in plan ordered by the district court. See Order No. U-17282-E. That order has not been appealed. Thus, the total amount in dispute in regard to the rate of return issue in this case is the approximately $20 million in revenues collected by Gulf States as a result of being accorded a 14% rather than a 12% return on equity during the year between the district court's injunctive order on February 18, 1988, and the Commission's order of March 1, 1989.
[30] This increase results from two factors: 1) equity is more expensive than debt because the equity investor demands a larger return on his investment to offset his greater risk, and 2) interest paid on debt is deductible for tax purposes, whereas dividends are not. South Central Bell Telephone Co. v. Louisiana Public Serv. Comm'n, 373 So.2d 478 (La.1979).
[31] Dr. Kennedy performed a discounted cash flow of five companies comparable in risk to Gulf States, and calculated that the "risk premium" for those companiesthe incremental cost of equity over their cost of debtwas 3.21%. He then added that premium to Gulf States' cost of debt to produce a rate of return on equity of 13.76%, which he rounded up to 14%. Dr. Olson also performed a discounted cash flow based on a group of selected utilities, which indicated that a rate of return of 12.97% to 13.47% was required to attract capital investment. He then increased that rate to allow for the special risk faced by Gulf States and for marketing costs, concluding that the company should be granted a return on equity of 15% to 15.5%. The Commission also notes that had Dr. Olson used his most recent data concerning growth rates of such factors as earnings, dividends, and book value, his resulting investor return requirement before upward adjustment for risk would have been 11.99%.
[32] The cases cited are South Central Bell Telephone Co. v. Louisiana Public Serv. Comm'n, 334 So.2d 189 (La.1976) and South Central Bell Telephone Co. v. Louisiana Public Serv. Comm'n, 340 So.2d 1300 (La.1976).
[33] The Commission vehemently denies that this case falls within the exception for rate decrease cases established in South Central Bell. It argues that this is instead a mammoth rate increase case. The Commission did not lower previously approved rates, but instead raised them to a level nonetheless perceived as inadequate by the company. It contends that the fact that a lower rate of return on equity (than that which had been permitted on the pre-River Bend rate base) was used in setting the higher rates does not change the proceeding into a rate decrease case, and is therefore irrelevant under South Central Bell.
[34] The Attorney General explains that if a utility could expect rates to be adjusted as soon as earnings begin to deviate from the fair return most recently fixed by the regulator, or could expect that the losses incurred in one year would be restored in the next, or the profits earned above the fair rate intended by the regulator taken away by the next order, there would be no reason for the utility to manage efficiently.
[35] La.Const. art. 4, § 21(D)(4) provides that:

If a proposed increase which has been put into effect is finally disallowed, in whole or in part, the utility shall make full refund, with legal interest thereon, within the time and in the manner prescribed by law.
[36] Although the Court found in South Central Bell, 555 So.2d 1370 (La.1990), that injunctive relief was appropriate despite the fact that the utility had failed to establish an unconstitutional confiscation, that finding was based on the fact that it was a rate decrease case, initiated by the Commission. This exception to the general rule is not applicable to the case before us, which, although it involves a decrease in rate of return on equity, is without question a rate increase case.
[37] In an exception to the jurisprudential rule developed in the line of cases cited above, this Court in Louisiana Power & Light Co. v. Louisiana Pub. Serv. Comm'n, 523 So.2d 850 (La. 1988), upheld an injunction in a rate increase case without specifically finding an unconstitutional confiscation. That case may perhaps be distinguished on its facts. The Commission's consultant had recommended, based on the utility's revenue deficiency, an $85.9 million rate increase, with $48 million ($45.9 million increase plus the financing charges on a $40 million deferral) entering the rate base immediately, and $40 million deferred until the following year. The Commission granted a $48 million rate increase "based on the consultants' recommended phase-in," but failed to establish the $40 million deferral. The Court concluded that the Commission's order reflected both a finding that the utility was entitled to an $85.9 million increase, and an intent to implement its consultant's phase-in plan. Under those circumstances, it held, the district court's issuance of a temporary injunction establishing the deferral had not been erroneous.

In any event, this Court, in opinions preceding and succeeding the Louisiana Power & Light case, has affirmed that in rate increase cases, an unconstitutional confiscation must be shown before injunctive relief can be afforded. See South Cent. Bell v. Louisiana Pub. Serv. Com'n, 340 So.2d 1300 (La.1976); South Cent. Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n, 555 So.2d 1370 (La.1990)
[38] See South Central Bell Telephone Co. v. Louisiana Public Serv. Comm'n, 555 So.2d 1370 (La. 1990); Louisiana Power & Light v. Louisiana Public Serv. Comm'n, 523 So.2d 850 (La.1988).
[39] In his dissent, Justice Dennis identifies three "legal errors" committed by the Commission in its application of the prudent investment rule. He first argues that the Commission failed to recognize that it must overcome a presumption of prudence before the burden shifts to the utility to prove the prudence of its investment in River Bend. Although the Commission, in its majority opinion, does not specifically discuss the burden of proof, the procedure which was followed in this case is consistent with an initial presumption of prudence, and with that employed by other public service commissions around the country when confronted with rate increase requests of the magnitude involved here. The staff investigation of the planning process which led to Gulf States' decision to restart construction of the nuclear plant clearly produced sufficient evidence to raise a serious doubt about the prudence of that decision and to shift the burden of proof to the utility, where, under the undisputed jurisprudence of this country, that burden then properly lay.

Justice Dennis next argues that "it is clearly evident from the commission's opinion" that its finding of imprudence relied substantially on deficiencies in Gulf States' planning process, rather than on an objective test of whether a reasonable utility manager could have made the same decision under the circumstances. That contention is directly refuted by the description in the opinion of the analysis which the Commission's consultants performed in order to objectively assess the kind of planning process which a prudent utility manager would have used during the relevant time period.
Justice Dennis' last argument is that the Commission applied, not a prudent investment test, but a test of whether the company followed the optimal strategy. An evaluation of Gulf States' decision-making process of necessity required a comparison of what a reasonable planner would have estimated the completion of River Bend to cost with the estimated cost of the available alternatives. However, the Commission's finding of imprudence did not rest on the fact that the company did not choose the least cost alternative, but rather on the finding that a reasonable planner, employing known economic assumptions and performing an appropriate economic analysis, would have been aware that the completion of River Bend would cost significantly more than other available options, and was therefore an uneconomic and costly choice, one which was in fact unreasonable.
[1] See Missouri ex rel Southwestern Bell Tel. Co. v. Public Service Comm., 262 U.S. 276, 289 n. 1, 43 S.Ct. 544, 547 n. 1, 67 L.Ed. 981 (1923) (Brandeis, J., concurring).
[2] Louisiana is unlikely to be immune from such an affliction.